WILLIAM B. MILLISON AND MARIE MILLISON, HIS WIFE; VERNON G. KRONMAIER AND DOROTHY KRONMAIER, HIS WIFE; HAROLD SCHWEBEL AND SUSAN SCHWEBEL, HIS WIFE; CLARENCE SCHWEBEL AND GERALDINE SCHWEBEL, HIS WIFE; FRANK BAPTISTE AND CATHERINE BAPTISTE, HIS WIFE; AND EDWARD B. AGAR AND EILEEN AGAR, HIS WIFE, PLAINTIFFS-APPELLANTS, v. E.I. DU PONT DE NEMOURS & COMPANY; WILLIAM E. NEELD, JR., M.D.; G.F. REICHWEIN, M.D.; AND ALBINAS SMULKSTYS, M.D., DEFENDANTS-RESPONDENTS, AND JOHNS-MANVILLE CORPORATION; OWENS-CORNING FIBERGLASS CORPORATION; KEENE CORPORATION; CELOTEX CORPORATION; RAYBESTOS-MANHATTAN CORPORATION; SEPCO CORPORATION; AMATEX CORPORATION; PHILLIP CAREY COMPANY; LIMPET CORPORATION; H.J. STEIN, M.D.; JOHN DOE, M.D.; RICHARD ROE, M.D.; JOHN DOE CORPORATION; AND RICHARD ROE CORPORATION, DEFENDANTS.

EVAN TAYLOR AND ROSINA TAYLOR, HIS WIFE; JOSEPH J. KUCZMARSKI AND LOUISE KUCZMARSKI, HIS WIFE; JOHN STILL AND ANNA L. STILL, HIS WIFE; LOUIS WALAT AND CATHERINE WALAT, HIS WIFE; NORRIS M. HILDEBRAND AND HILDA HILDEBRAND, HIS WIFE; PASQUALE S. CHILLIRI, SR., AND MARY CHILLIRI, HIS WIFE; ANTONIO DIPIETRO; ROBERT MCKIBBIN AND ANNA MCKIBBIN, HIS WIFE; ROBERT TANNER AND ROSEMARY TANNER, HIS WIFE; LOUIS J. KIRSCH AND EDITH KIRSCH, HIS WIFE; HOWARD H. AMOS AND ANN AMOS, HIS WIFE; HAROLD KNORR AND ELEANOR KNORR, HIS WIFE; GEORGE SULLIVAN AND PAULINE SULLIVAN, HIS WIFE; LOUIS P. FAVERIO AND DOLORES FAVERIO, HIS WIFE; ARTHUR KIRNER AND MARGERY KIRNER, HIS WIFE; EARL STANTON AND MADELINE STANTON, HIS WIFE; DANIEL MULLEN AND SHIRLEY MULLEN, HIS WIFE; GEORGE MILTON GROSS AND ALICE M. GROSS, HIS WIFE; CALVIN R. SHAW AND DOLORES SHAW, HIS WIFE; PAUL DONALD LONG AND GRACE LONG, HIS WIFE; DAVID ROBERT RAMSEY AND VIRGINIA RAMSEY, HIS WIFE; AND EUGENE BLECKLEY, PLAINTIFFS-APPELLANTS, v. E.I. DU PONT DE NEMOURS & COMPANY; WILLIAM E. NEELD, JR., M.D.; G.F. REICHWEIN, M.D.; AND ALBINAS SMULKSTYS, M.D., DEFENDANTS-RESPONDENTS, AND JOHNS-MANVILLE CORPORATION; OWENS-CORNING FIBERGLASS CORPORATION; KEENE CORPORATION; CELOTEX CORPORATION; RAYBESTOS-MANHATTAN CORPORATION; SPECO CORPORATION; AMATEX

CORPORATION; PHILLIP CAREY COMPANY; LIMPET COR-
PORATION; H.J. STEIN. M.D.; JOHN DOE, M.D.; RICHARD
ROE, M.D.; JOHN DOE CORPORATION; AND RICHARD ROE
CORPORATION, DEFENDANTS.

EMMA F. GOLT, ADMINISTRATRIX AD PROSEQUENDUM AND
GENERAL ADMINISTRATRIX OF JAMES E. GOLT; MARIE M.
POLLOCK, EXECUTRIX OF THE ESTATE OF MANUEL POL-
LOCK; AND MARY K. FERRETTI, EXECUTRIX OF THE ES-
TATE OF LEVIO P. FERRETTI, DECEASED, PLAINTIFFS-AP-
PELLANTS, v. E.I. DU PONT DE NEMOURS & COMPANY;
WILLIAM E. NEELD, JR., M.D.; AND G.F. REICHWEIN, M.D.,
DEFENDANTS-RESPONDENTS, AND JOHNS-MANVILLE
CORPORATION; OWENS-CORNING FIBERGLASS CORPORA-
TION; JOHN DOE(S), M.D.; AND JOHN DOE CORPORATIONS
(1–30), DEFENDANTS.

JOHN R. TAGGART AND ELEANOR TAGGART, HIS WIFE, PLAIN-
TIFFS-APPELLANTS, v. E.I. DU PONT DE NEMOURS & COM-
PANY; WILLIAM E. NEELD, JR., M.D.; AND ALBINAS
SMULKSTYS, M.D., DEFENDANTS-RESPONDENTS, AND
JOHNS-MANVILLE CORPORATION; OWENS-CORNING FI-
BERGLASS CORPORATION; JOHN DOE, M.D.; RICHARD
ROE, M.D.; AND JOHN DOE CORPORATIONS (1–20), DE-
FENDANTS.

ORLANDO CAMELI AND ANN, HIS WIFE, PLAINTIFFS-APPEL-
LANTS, v. E.I. DU PONT DE NEMOURS & COMPANY; G.F.
REICHWEIN, M.D.; AND ALBINAS SMULKSTYS, M.D., DE-
FENDANTS-RESPONDENTS, AND JOHNS-MANVILLE CORPO-
RATION; OWENS-CORNING FIBERGLASS CORPORATION;
PHILLIP CAREY COMPANY; UNITED ASBESTOS & RUBBER
CO., D/B/A UNACRO; JOHN DOE, M.D.; RICHARD ROE, M.D.;
AND JOHN DOE CORPORATIONS (1–20), DEFENDANTS.

Argued April 2, 1984—Re-argued September 10, 1984.
Decided December 10, 1985.

164

*David Jacoby* argued the cause for appellants (*Tomar, Parks, Seliger, Simonoff & Adourian,* attorneys; *William Tomar,* of counsel; *James Katz,* on the briefs).

*Thomas L. Morrissey* argued the cause for respondents (*Carpenter, Bennett & Morrissey,* attorneys; *Rosemary A. Hall,* on the briefs).

*Verice M. Mason,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae* Public Advocate (*Joseph H. Rodriguez,* Public Advocate, attorney; *Verice M. Mason* and *Michael L. Perlin,* Special Counsel to the Commissioner, of counsel and on the brief).

*Sebastian P. Lombardi* submitted a brief on behalf of *amicus curiae* Edwin Davis Merrill, M.D., (*Budd, Larner, Kent, Gross, Picillo & Rosenbaum,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

■ The New Jersey Workers' Compensation Act, *N.J.S.A.* 34:15–1 to –128 (Compensation Act), contains an exclusive-remedy provision in *N.J.S.A.* 34:15–8. The issue in these consolidated cases is whether that provision precludes employees who have suffered occupational diseases from maintaining a separate tort action against their employer and against company physicians. The employees charge the employer and physicians with intentionally exposing the employees to asbestos in the workplace, deliberately concealing from employees the risks of exposure to asbestos, and fraudulently concealing specific medical information obtained during employee physical examinations that reveal diseases already contracted by workmen. We hold

that although the employees are limited to workers' compensation benefits for any initial occupational-disease disabilities related to the hazards of their employment experience, the Compensation Act does not bar plaintiffs' cause of action for aggravation of those illnesses resulting from defendants' fraudulent concealment of already-discovered disabilities.

## I

Plaintiffs are former E.I. du Pont de Nemours (du Pont) employees and their spouses (reference to plaintiffs henceforth is to the employees).  Defendants are du Pont and its company physicians who had worked at the du Pont plants at which plaintiffs-employees were stationed.  Also named as defendants are certain manufacturers and suppliers of asbestos.  Plaintiffs' claims against those defendants are unaffected by the disposition of this appeal; therefore, all subsequent references to defendants will include only du Pont and its company physicians.

Five separate complaints were filed by different sets of plaintiffs.  But for the identities and descriptions of the plaintiffs, these complaints are identical in their basic allegations, and whatever differences there may be are irrelevant to our discussion.

Plaintiffs' brief before this Court summarizes their claims as follows:

> The gravamen of the plaintiffs' claims [is] that du Pont and its doctors intentionally injured the plaintiffs by deliberately exposing them to asbestos and aggravated these injuries by conspiring to [conceal] and fraudulently concealing from the plaintiffs knowledge of diseases known by these defendants to have been caused by asbestos exposure and already contracted by the plaintiffs.  Plaintiffs have suffered grievous and irreversible injuries both as a result of their initial exposure to asbestos and the failure of du Pont and its doctors to reveal diseases already contracted by the plaintiffs and known to the defendants.

Defendants filed a motion for summary judgment in the *Millison* case and moved in the four companion matters to dismiss plaintiffs' complaints for failure to state a claim upon

which relief could be granted. Defendants' argument in support of their motions was that plaintiffs' exclusive remedy was recovery under the Compensation Act. The trial court consolidated all claims for the purpose of disposing of the motions for dismissal. It originally denied the motions without prejudice and instructed plaintiffs to depose the defendants-physicians in order to create a more complete factual record. When defendants later renewed their motions to dismiss, the trial court granted summary judgment to du Pont but refused to dismiss the claims against the company doctors.

All parties sought interlocutory review in the Appellate Division, where their motions for leave to appeal were denied. Thereafter, we granted leave to appeal and summarily remanded the matter to the Appellate Division for consideration on the merits, 91 *N.J.* 181 (1982).

In an unreported opinion, the Appellate Division reversed the trial court's denial of the physicians' motion for summary judgment and affirmed the trial court's judgment in favor of du Pont. We granted plaintiffs' petition for certification, 94 *N.J.* 604 (1982), and now affirm in part and reverse in part.

II

Under Rule 4:46–2 the court shall grant summary judgment if a discriminating search of the merits in the pleadings, depositions, and admissions on file, together with the affidavits submitted on the motion, clearly shows that there is no genuine issue of material fact requiring disposition at a trial. *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 74 (1954); *see Robbins v. Jersey City,* 23 *N.J.* 229, 240–41 (1957). It is with this standard in mind that we examine plaintiffs' specific allegations.

Plaintiffs-employees are all past or present workers at defendant du Pont's Chamber Works or Repauno plants. Both plants are involved in the manufacture of chemicals; each contains an extensive amount of piping through its facilities.

As asbestos was often used for insulation purposes, the pipes in these plants were at one time surrounded by asbestos. It is therefore reasonably inferable that certain employees at the Chamber Works and Repauno plants were exposed to the asbestos insulation and inhaled asbestos fibers.

Defendants-physicians are Dr. W.E. Neeld, the medical director for the Chamber Works plant, and Drs. G.F. Reichwein and A. Smulkstys, former du Pont physicians at the Repauno plant. As medical director of Chamber Works, Dr. Neeld was required to supervise a medical staff of thirty-eight people responsible for meeting the health-care needs of the approximately 4,800 Chamber Works employees. The duties of Drs. Reichwein and Smulkstys, as plant physicians, included examining and treating plant employees, providing physical examinations, and being available for sick call and consultations.

The thrust of plaintiffs' allegations is that there was something akin to a conspiratorial agreement between du Pont and its medical staff that resulted in harm to plaintiffs. They assert generally that defendants, with knowledge of the adverse health consequences of asbestos use and exposure, and as part of a concerted plan for profit, deliberately exposed the plaintiffs to a dangerous work environment. Their claims focus on two separate situations, however.

The first count of the complaint avers that defendants knew or should have known of the dangers associated with asbestos exposure, that they therefore had a duty to inform plaintiffs and to protect them from those dangers, but that they nonetheless acted intentionally to conceal from plaintiffs all information regarding the health hazards of asbestos. In count two of their complaint, plaintiffs allege that du Pont and the company physicians fraudulently concealed from plaintiffs the fact that company medical examinations had revealed that certain plaintiffs-employees had contracted asbestos-related diseases. They assert that each year the du Pont doctors would give employees

complete physical examinations, including chest x-rays, pulmonary function tests, electrocardiograms, urine analyses, and blood tests.[1] Plaintiffs contend that the results of these physical exams indicated that plaintiffs-employees had contracted serious pulmonary and respiratory abnormalities associated with exposure to asbestos. They further maintain that rather than provide medical treatment for these ailing employees, defendants fraudulently concealed plaintiffs' asbestos-related diseases and sent them back into the workplace, where their initial infirmities were aggravated by additional exposure to asbestos. Plaintiffs claim that the time from defendants' first knowledge of the employee's condition to the time when the employee was told of the danger was as long as eight years.

## III

It is undisputed that plaintiffs' injuries, if proven, are compensable under the Compensation Act. The controversy presented, however, calls for a determination of whether the legislature intended that the Compensation Act should serve as a worker's sole and exclusive remedy under circumstances such as those alleged. The pertinent statute, *N.J.S.A.* 34:15–8, declares that when, by express or implied agreement, the parties have accepted the provisions of the Compensation Act and the employee qualifies for benefits under the conditions of the Act, the employee shall ordinarily be barred from the pursuit of other remedies.[2] As the statute expressly indicates, however, an exception to the exclusivity provision is available when plaintiffs can prove an "intentional wrong."

Such agreement shall be a surrender by the parties thereto of their rights to any other method, form or amount of compensation or determination thereof

---

[1]Physical examinations were given biannually for employees under age 40 and annually for employees 40 and older.

[2]Absent an express written statement to the contrary, *N.J.S.A.* 34:15–9 creates a presumption that the parties to every employment contract have agreed to be governed by the provisions of the Compensation Act.

than as provided in this article and an acceptance of all the provisions of this article, and shall bind the employee and for compensation for the employee's death shall bind the employee's personal representatives, surviving spouse and next of kin, as well as the employer, and those conducting the employer's business during bankruptcy or insolvency.

If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, *except for intentional wrong.*

[*N.J.S.A.* 34:15–8 (emphasis added).]

Plaintiffs argue that their charges that defendants knowingly and deliberately exposed employees to a hazardous work environment and fraudulently concealed existing occupational diseases are sufficient to fall within the Act's limited "intentional wrong" exception and to take their injuries outside the intended scope of the Compensation Act. However, as noted by the Appellate Division in granting defendants' motions to dismiss, in order to satisfy the Compensation Act's definition of "intentional wrong," claimants have heretofore been required to show a deliberate intention to injure. *See, e.g., Bryan v. Jeffers,* 103 *N.J.Super.* 522, 523–24 (App.Div.1968) certif. den., 53 *N.J.* 581 (1969) (intentional wrong in compensation statute means "deliberate intention" and is not equatable with gross negligence or similar concepts importing constructive intent); *Arcell v. Ashland Chem. Co.,* 152 *N.J.Super.* 471, 495–96 (Law Div.1977) (allegations of willfully and wantonly failing to undertake known safety and health procedures for protection of employees, and negotiating with governmental bodies so that contemplated implementation of such procedures would be ignored or delayed, are insufficient to satisfy intentional-wrong standard); *Copeland v. Johns-Manville Prods. Corp.,* 492 *F.Supp.* 498 (D.N.J. 1980) (*Bryan* requires that "intentional wrong" exception be given a narrow construction; allegations that employer, aware of dangerous working conditions, maliciously and willfully exposed workers to hazardous asbestos products and intentionally withheld information concerning the health risks do not meet the standard for intentional wrong); *Petruska v. Johns-Manville,* 83 *F.R.D.* 39 (E.D.Pa.1979) (claims of intentionally allowing de-

fendant to be exposed to asbestos and failing to warn of known health hazards of asbestos do not meet New Jersey Workers' Compensation Act's strict definition of intentional wrong, which requires deliberate intention to injure). This requirement of proving actual intent to injure in order to avoid the exclusivity of a workers' compensation act is the subject of comment by Professor Larson in his multivolume treatise on Workers' Compensation Law:

> Even if the alleged conduct goes beyond aggravated negligence, and includes such elements as knowingly permitting a hazardous work condition to exist, knowingly ordering claimant to perform an extremely dangerous job, willfully failing to furnish a safe place to work, or even willfully and unlawfully violating a safety statute, this still falls short of the kind of actual intention to injure that robs the injury of accidental character.

> \*     \*     \*     \*     \*     \*     \*     \*

> If these decisions seem rather strict, one must remind oneself that what is being tested here is not the degree of gravity or depravity of the employer's conduct, but rather the narrow issue of intentional versus accidental quality of the precise event producing injury. The intentional removal of a safety device or toleration of a dangerous condition may or may not set the stage for an accidental injury later. But in any normal use of the words, it cannot be said, if such an injury does happen, that this was deliberate infliction of harm comparable to an intentional left jab to the chin.

> [2A A. Larson, The Law of Workmen's Compensation, § 68.13 at 13–22 to 13–27 (1983) (footnotes omitted).]

The approach explicated by Professor Larson emphasizes the narrow or limited character of the exception. See Copeland v. Johns-Manville Prods. Corp., supra, 492 F.Supp. at 501; see also Service Armament v. Hyland, 70 N.J. 550, 558–59 (1976) (stating general principle that exceptions in a legislative enactment are to be strictly but reasonably construed, consistent with the manifest reason and purpose of the law). The approach of construing and applying the exception in the most limited fashion consistent with the purpose of the law is followed by the vast majority of jurisdictions that have considered whether allegedly egregious employer conduct warrants the recognition of a separate cause of action outside the compensation system. See, e.g., Burke v. Interlake, Inc., 600 F.Supp. 59 (D.Conn.1984) (allegations of willful, wanton, and intentional

failure to warn of dangers in conveyor system, failure to install adequate safety equipment, and failure to comply with state and federal safety laws—workers' compensation is exclusive remedy); *Shearer v. Homestake Mining Co.,* 557 *F.Supp.* 549 (D.S.D.1983), *aff'd,* 727 *F.*2d 707 (8th Cir.1984) (allegations of creating and maintaining an unsafe workplace, deliberately violating government safety standards, or personal animosity of a supervisor were insufficient to state a cause of action under the "intentional tort" exception to compensation exclusivity); *Prescott v. United States,* 523 *F.Supp.* 918 (D.Nev.1981), *aff'd,* 731 *F.*2d 1388 (9th Cir.1984) (willful intent to send employee into test areas immediately after nuclear detonations to perform his job is not the same as intent to make workers sick; Nevada law would require exclusive remedy in state Occupational Disease Act); *Houston v. Bechtel Assocs., Professional Corp.,* 522 *F.Supp.* 1094 (D.D.C.1981) (Longshoremen's and Harbor Workers' Compensation Act is exclusive remedy of employees suffering from silicosis who allege employer willfully exposed them to unreasonably high levels of silica dust in violation of safety regulations); *Tysenn v. Johns-Manville Corp.,* 517 *F.Supp.* 1290 (E.D.Pa.1981) (knowingly and deliberately exposing employees to dangers of asbestos compensable exclusively in Occupational Disease Act); *Phifer v. Union Carbide Corp.,* 492 *F.Supp.* 483 (E.D.Ark.1980) (exclusive remedy of plant chemist injured by exposure to harmful chemicals was workers' compensation regardless of employer's intentional failure to warn of known hazards, failure to provide protective gear, and failure to provide adequate ventilation in the workplace); *Kofron v. Amoco Chems. Corp.,* 441 *A.*2d 226 (Del. 1982) (no separate cause of action allowed when employer knew of dangers of asbestos, yet deceived plaintiffs by asserting that it was safe to work in close proximity to asbestos materials); *Blade v. Anaconda Aluminum Co., Inc.,* 452 *N.E.*2d 1036 (Ind.Ct.App.1983) (even assuming employer intentionally pursued a course of conduct that jeopardized workers' safety, nevertheless the conduct can be characterized at most as gross-

ly negligent or wanton; exclusive remedy is workers' compensation). *But see Boudeloche v. Grow Chem. Coatings Corp.,* 728 *F.*2d 759 (5th Cir.1984) (pleading alleging that supervisor ordered employee to continue painting interior of tank despite fact that toxic fumes had caused employee to become dizzy and to vomit blood was sufficient to state claim under "intentional act" exception to exclusivity of compensation act); *Blankenship v. Cincinnati Milacron Chems., Inc.,* 69 *Ohio St.*2d 608, 433 *N.E.*2d 572, *cert. denied,* 459 *U.S.* 857, 103 *S.Ct.* 127, 74 *L.Ed.*2d 110 (1982) (intentional torts of employer are not immunized by compensation act; allegations of employer willfully disregarding known health hazards of noxious chemicals in the workplace were sufficient to withstand motion to dismiss under "intentional tort" exception to exclusivity of workers' compensation act). *See generally* 2A *A. Larson, supra,* at § 68.13 (collecting cases); Annot., 96 *A.L.R.*3d 1064 (1980) (same). That the foregoing authorities do not, as the dissent so forcefully points out, *post* at 191–193, enjoy a rigid consistency in their various treatments of the "intentional wrong" test is clear; what is equally clear is that although different jurisdictions may craft different formulations, whatever formulation is used represents a conscious effort to impose severe restrictions on the exception, bringing it as close to "subjective desire to injure" as the nuances of language will permit, while at the same time recognizing the problems of proof inherent in any attempt to demonstrate subjective intent.

## IV

In determining whether these plaintiffs have stated a cause of action under the "intentional wrong" exception to the exclusive-remedy provision of the Compensation Act we must be faithful to the legislative goals of the workers' compensation system. To the end that the system and those goals may be fully understood, we pause to focus on the development of the Compensation Act and the underlying premises that support it.

The stimulus for workers' compensation legislation arose out of an increasing number of industrial accidents and the inadequacies of the common-law tort remedies that were available to aid injured workers. 1 *A. Larson, supra,* § 4.00 at 23. Injured employees seeking tort recovery were confronted with the difficult task of persuading nonunion coworker-witnesses to testify against the employer. Even if successful at gathering witnesses, plaintiffs-employees were inevitably confronted with the "unholy trinity" of employer defenses—contributory negligence, assumption of risk, and the fellow servant rule—which served to protect the employer from legal liability even though he had failed in his duty as master to protect his servants. *W. Prosser and W. Keeton, The Law of Torts,* § 80 at 569 (5th ed. 1984). Thus, various authorities have estimated that at common law up to 94% of industrial accidents went uncompensated. *Id.* at 572 n. 43.

In 1911, in response to these common-law inequities, the legislature passed our Workers' Compensation Act. *L.* 1911, *c.* 95. This legislation involved a historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment. Thus the *quid pro quo* anticipated by the Act was that employees would receive assurance of relatively swift and certain compensation payments, but would relinquish their rights to pursue a potentially larger recovery in a common-law action.

However, claimants suffering from work-related occupational diseases were initially unsuccessful in their efforts to recover compensation under the Act because it could not be proved that they had been injured by "accident"—the operative term permitting recovery under the statute. *See Hichens v. Magnus Metal Co.,* 35 *N.J.L.J.* 327 (1912), in which a factory employee suffering from copper poisoning caused by inhaling copper dust was denied compensation under the 1911 Act. Thereafter, the legislature, apparently recognizing that workers who had con-

tracted diseases due to gradual exposure to certain potentially-hazardous working conditions were no less in need of the Compensation Act's protection than were employees injured by "accident," amended the Act to include occupational diseases within its coverage. *L.* 1924, *c.* 124.

Initially, only nine named occupational diseases were compensable under the terms of the Act: anthrax, lead poisoning, mercury poisoning, arsenic poisoning, phosphorus poisoning, poisoning from all homologues and derivatives of benzine, wood alcohol poisoning, chrome poisoning, and caisson disease. The right to compensation was conditioned on the employee notifying the employer of his disability due to occupational disease within five months of his last exposure to the harmful substances. In order to make additonal occupational diseases compensable, the legislature passed various amendments over the years: *L.* 1926, *c.* 31 (mesothorium or radium necrosis); *L.* 1931, *c.* 33 (radium poisoning); *L.* 1945, *c.* 53 (dermatitis venenata).

Moreover, a totally separate system of elective compensation was enacted for the diseases of asbestosis and silicosis. *L.* 1944, *c.* 88, codified at *N.J.S.A.* 34:15–35.1 to –35.9. Compensation was to be awarded for death or total disability resulting from silicosis or asbestosis when "the disease was due to the nature of" the employment, *id.* at § 3, 34:15–35.3, and the Act specifically indicated that there shall be no liability in tort for damages on account of death or total disability from silicosis or asbestosis. *Id.* at § 5, 34:15–35.5. This separate system of compensation was repealed at *L.* 1951, *c.* 59, and asbestosis and silicosis were implicitly returned to the general occupational-disease coverage, which had since replaced its limited list of specific-named occupational diseases with a definitional phrase, "compensable occupational disease." *L.* 1949, *c.* 29. The current definition of "compensable occupational disease" is codified at *N.J.S.A.* 34:15–31.

The point to be emphasized is that the express inclusion of occupational diseases as part of the Compensation Act reflects

a general awareness of potentially-hazardous conditions in the workplace that may result in debilitating diseases necessitating compensation. Early versions of the Compensation Act relating to occupational diseases indicate that certain defined workplace diseases, *i.e.*, asbestosis, are known to be an enemy of the workman, and that relief is to be awarded under the Act to employees stricken with these illnesses. In addition, the current statutory approach of providing only a general compensable occupational-disease definition rather than listing the specific compensable illnesses suggests either that the occupational-disease risks of the workplace are too numerous to list separately or that in the future employees may contract occupational diseases, as yet unknown, that should nonetheless be compensated under the terms of the Act (if such illnesses can be proven and their causes can be traced to conditions of employment). Suffice it to say that in revamping the Compensation Act over the years, the legislature has not been blind to the fact that each year an unspecified number of workers will be disabled with diseases contracted as a result of the hazards of the workplace.

V

Mindful of the origins of the Compensation Act and its subsequent development, we turn to the precise legal issue posed by this appeal: what categories of employer conduct will be sufficiently flagrant so as to constitute an "intentional wrong," thereby entitling a plaintiff to avoid the "exclusivity" bar of *N.J.S.A.* 34:15–8? Plaintiffs contend that du Pont and the doctors, in exposing the employees to asbestos and concealing medical information, acted knowingly and deliberately, not accidentally or negligently, so that defendants' conduct must be considered an "intentional wrong" within the meaning of the statute. Defendants, relying on the bulk of the authority on this topic, conversely assert that only conduct amounting to actual intent to injure employees will be sufficient to qualify as an "intentional wrong" in the context of a workers' compensa-

tion statute, and that the plaintiffs' complaints fall short of alleging "deliberate infliction of harm comparable to an intentional left jab to the chin." 2A *A. Larson, supra,* § 68.13 at 13–27.

Although we are certain that the legislature could not have intended that the system of workers' compensation would insulate actors from liability outside the boundaries of the Act for all willful and flagrant misconduct short of deliberate assault and battery, we are equally sure that the statutory scheme contemplates that as many work-related disability claims as possible be processed exclusively within the Act. Moreover, if "intentional wrong" is interpreted too broadly, this single exception would swallow up the entire "exclusivity" provision of the Act, since virtually all employee accidents, injuries, and sicknesses are a result of the employer or a co-employee intentionally acting to do whatever it is that may or may not lead to eventual injury or disease. Thus in setting an appropriate standard by which to measure an "intentional wrong," we are careful to keep an eye fixed on the obvious: the system of workers' compensation confronts head-on the unpleasant, even harsh, reality—but a reality nevertheless—that industry knowingly exposes workers to the risks of injury and disease.

The essential question therefore becomes what level of risk-exposure is so egregious as to constitute an "intentional wrong." We are confident that the *quid pro quo* of workers' compensation—employer makes swift and certain payment without regard to his own fault in exchange for immunity from liability at law—can best be preserved by applying the "intent" analysis of Dean Prosser to determine what is an "intentional wrong" within the meaning of the Act. According to Prosser,

the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong.

[*W. Prosser and W. Keeton, supra,* § 8 at 36.]

*See also Restatement 2d of Torts,* § 8A (meaning of intent is that actor desires to cause consequences of his act or is substantially certain that such consequences will result from his actions).

In adopting a "substantial certainty" standard, we acknowledge that every undertaking, particularly certain business judgments, involve some risk, but that willful employer misconduct was not meant to go undeterred. The distinctions between negligence, recklessness, and intent are obviously matters of degree, albeit subtle ones, as the thoughtful dissent so powerfully points out. In light of the legislative inclusion of occupational diseases within the coverage of the Compensation Act, however, the dividing line between negligent or reckless conduct on the one hand and intentional wrong on the other must be drawn with caution, so that the statutory framework of the Act is not circumvented simply because a known risk later blossoms into reality. We must demand a virtual certainty. *See Blankenship, supra,* 433 *N.E.*2d at 581 (Locher, J., concurring); *cf. Restatement 2d of Torts* § 500, comment (f), differentiating reckless misconduct from intentional wrongdoing ("strong probability" is a different thing from the "substantial certainty" without which an actor cannot be said to intend the harm that his act produces). It may help to perceive "substantial certainty" not so much as a substantive test itself nor as a substitute for a subjective desire to injure, as a specie of evidence that will satisfy the requirement of cases such as *Bryan v. Jeffers, supra,* 103 *N.J.Super.* at 523–24, that "deliberate intention" be shown. Contrary to the dissent's suggestion, *post* at 192 n. 1, we do not, by today's decision, repudiate earlier decisions in this area represented by *Bryan* and *Arcell v. Ashland Chem. Co., supra,* 152 *N.J.Super.* at 495–96; rather, we see our determination as a logical development in this sensitive field of the law.

■ There is another significant component to the level of risk exposure that will satisfy the "intentional wrong" excep-

tion. Courts must examine not only the conduct of the employer, but also the context in which that conduct takes place: may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act?

Examining the allegations in these cases in light of the foregoing principles, we conclude that count one of plaintiffs' complaints seeking damages beyond those available through workers' compensation for their initial work-related occupational diseases must fall. Although defendants' conduct in knowingly exposing plaintiffs to asbestos clearly amounts to deliberately taking risks with employees' health, as we have observed heretofore the mere knowledge and appreciation of a risk—even the strong probability of a risk—will come up short of the "substantial certainty" needed to find an intentional wrong resulting in avoidance of the exclusive-remedy bar of the compensation statute. In the face of the legislature's awareness of occupational diseases as a fact of industrial employment, we are constrained to conclude that plaintiffs-employees' initial resulting occupational diseases must be considered the type of hazard of employment that the legislature anticipated would be compensable under the terms of the Compensation Act and not actionable in an additional civil suit.

We acknowledge a certain anomaly in the notion that employees who are severely ill as a result of their exposure to asbestos in their place of employment are forced to accept the limited benefits available to them through the Compensation Act. Despite the fact that the current system sometimes provides what seems to be, and at times doubtless is, a less-than-adequate remedy to those who have been disabled on the job, all policy arguments regarding any ineffectiveness in the current compensation system as a way to address the problems

of industrial diseases and accidents are within the exclusive province of the legislature.

That body has not ignored the pervasive problem of hazardous substances in the workplace and community. In 1983 the legislature enacted the "Worker and Community Right to Know" Act, *L.* 1983, *c.* 315, codified at *N.J.S.A.* 34:5A–1 to –31, effective August 29, 1984, sparked in part by the conclusion that "individuals have an inherent right to know the full range of the risks they face so that they can make reasoned decisions and take informed action concerning their employment and their living conditions." [3] The Act imposes disclosure requirements on employers within the manufacturing sector and outside the manufacturing sector in respect of both "workplace" and "environmental" substances. Under the Act every employer, as defined by the Act, must establish an educational and training program for his employees, designed

> to inform employees in writing and orally of the nature of the hazardous substances to which they are exposed in the course of their employment and the potential health risks which the hazardous substance pose, and to train them in the proper and safe procedures for handling the hazardous substances under all circumstances.

[*N.J.S.A.* 34:5A–13.]

---

[3] A New Jersey federal district court ruled that the entire "Right to Know" Act as applied to employers and workers in the manufacturing sector was preempted by the Occupational Safety and Health Act of 1970, 29 *U.S.C.* §§ 651–78 (1982), and OSHA's Hazard Communication Standard, 29 *C.F.R.* § 1900.1200 (1984); the "Right to Know" Act as applied to employers not in the manufacturing sector was held not to be preempted, however. *New Jersey State Chamber of Commerce v. Hughey,* 600 *F.Supp.* 606 (D.N.J.1985). On appeal, a Third Circuit panel, per Judge Gibbons, affirmed the District Court's conclusion that "the specific sections of the Right to Know Act directed to the identification and disclosure of work place hazardous substances, are preempted to the manufacturing sector of the federal Hazard Communication Standard." *New Jersey State Chamber of Commerce v. Hughey,* 774 *F.*2d 587, 598 (1985). The Court of Appeals affirmed all the other aspects of the District Court's ruling except for its conclusion that the provisions of the "Right to Know" Act pertaining to the identification and disclosure of environmental hazardous substances were unseverable and thus preempted. Although under this decision the portions of the "Right to Know" Act applicable to this case are preempted, the Act nevertheless remains as an exposition of state public policy on these issues.

Moreover, any employee is entitled to a copy of a workplace survey, hazardous substance fact sheet, or, where applicable, an environmental survey filed pursuant to the provisions of the Act for the facility at which he is employed. *N.J.S.A.* 34:5A–16. The statute gives the Superior Court jurisdiction over civil actions in law or equity, which any person may bring against "any employer for a violation of any provision of [the Act] or any rule and regulation promulgated pursuant thereto" or against the Departments of Environmental Protection or Health for failure to enforce the Act. *N.J.S.A.* 34:5A–23. The Commissioners of the foregoing Departments are given broad enforcement powers, including the imposition of substantial penalties. *N.J.S.A.* 34:5A–31.

We conclude, therefore, that the legislature must have made a studied decision to address the problems associated with hazardous substances in the workplace in some manner other than simply expanding the system of workers' compensation. Surely that legislative determination was a reasonable one. Despite the fact that in some instances it is an obviously unattractive solution to preclude workers such as are represented by the plaintiffs before us from suing at common law for full reparation for their initial illnesses, the express terms and underlying purposes of the Compensation Act compel that result. In the absence of constitutional defects we must enforce the legislative will. Count one of plaintiffs' complaints was properly dismissed.

Plaintiffs have, however, pleaded a valid cause of action for aggravation of their initial occupational diseases under the second count of their complaints. Count two alleges that in order to prevent employees from leaving the workforce, defendants fraudulently concealed from plaintiffs the fact that they were suffering from asbestos-related diseases, thereby delaying their treatment and aggravating their existing illnesses. As noted earlier, du Pont's medical staff provides company employees with physical examinations as part of its package of medical

services. Plaintiffs contend that although plaintiffs' physical examinations revealed changes in chest x-rays indicating asbestos-related injuries, du Pont's doctors did not inform plaintiffs of their sicknesses, but instead told them that their health was fine and sent them back to work under the same hazardous conditions that had caused the initial injuries.

These allegations go well beyond failing to warn of potentially-dangerous conditions or intentionally exposing workers to the risks of disease. There is a difference between, on the one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illnesses, and, on the other, actively misleading the employees who have already fallen victim to those risks of the workplace. An employer's fraudulent concealment of diseases already developed is not one of the risks an employee should have to assume. Such intentionally-deceitful action goes beyond the bargain struck by the Compensation Act. But for defendants' corporate strategy of concealing diseases discovered in company physical examinations, plaintiffs would have minimized the dangers to their health. Instead, plaintiffs were deceived—or so they charge—by corporate doctors who held themselves out as acting in plaintiffs' best interests. The legislature, in passing the Compensation Act, could not have intended to insulate such conduct from tort liability. We therefore conclude that plaintiffs' allegations that defendants fraudulently concealed knowledge of already-contracted diseases are sufficient to state a cause of action for aggravation of plaintiffs' illnesses, as distinct from any claim for the existence of the initial disease, which is cognizable only under the Compensation Act.

This approach of allowing plaintiffs to bring suit for aggravation of original diseases as a result of company physicians' fraudulent concealment of existing pulmonary diseases has been adopted by the California Supreme Court in *Johns-Manville Prods. Corp. v. Contra Costa Superior Court*, 27 *Cal.*3d 465, 612 *P.*2d 948, 165 *Cal.Rptr.* 858 (1980), despite its being

criticized in a minority opinion as representing counter-productive public policy. *Id.* at 479–80, 612 *P.*2d at 956–57, 165 *Cal.Rptr.* at 866–67, (Clark, J., dissenting). We recognize, of course, that California's statute is completely different from ours, providing as it does for increased recovery when the employer's misconduct is determined to have been "serious and willful." But the *Contra Costa* opinions serve to illustrate the underlying disagreement as to public policy, the argument against our result being that allowing this separate cause of action will deter the initiation and maintenance of corporate medical programs. Justice Clark explained this point of view:

> I am afraid that today's lesson will not be lost on employers: Should they try to remain ignorant of employees' health problems and thereby disengage themselves from special medical programs for fear of triggering today's tort liability?
>
> \*  \*  \*  \*  \*  \*  \*  \*
>
> The majority have drawn a classification between employers who do not engage in medical programs to discover occupational illnesses and thus will have their liability limited to workers' compensation, and employers who maintain such programs and thereby run the risk of tort liability in addition to compensation liability. If such a classification is warranted, does not public policy require the exposure to liability be reversed?
>
> [*Id.*, 612 *P.*2d at 957, 165 *Cal.Rptr.* at 867.]

We remain unpersuaded by these concerns, however, because corporate medical departments will remain immune from liability at common law for all conduct short of intentional wrongs. Under our holding, all degrees of negligence continue to be subject to the "exclusive remedy" bar of compensation. Thus, these plaintiffs now face the unenviable burden of proving a deliberate corporate strategy to conceal plaintiffs' asbestos-related diseases that were discovered by defendants-doctors in corporate physical examinations. Proof that the doctors negligently misdiagnosed plaintiffs' x-rays or estimated poorly concerning the seriousness of plaintiffs' maladies will be insufficient to establish a cause of action outside the Compensation Act. If, however, plaintiffs can in fact prove their allegations of fraudulent concealment of known diseases by defendants-doctors, we think it wholly proper that defendants be held to

answer for their misconduct. Those corporate medical departments that do their best to provide legitimate medical services to their workers, yet commit a negligent error along the way, have no reason to fear increased liability as a result of our holding. On the other hand, those corporations that would use their medical departments as a tool to prevent employees from learning of known injuries that are substantially certain to be aggravated by lack of disclosure must be deterred from embarking on such a course of conduct.

## VI

Defendant du Pont additionally argues that according to the express statutory language, the "intentional wrong" exception of *N.J.S.A.* 34:15–8, see *supra* at 170–172, applies only to co-employees so that workers' compensation is still plaintiffs' exclusive remedy with respect to its employer, du Pont. In support for this position, du Pont indicates that an earlier proposed, but never enacted, draft of *N.J.S.A.* 34:15–8 expressly included *employer* actions as being subject to the "intentional wrong" exception to exclusivity. Du Pont contends that because this proposed language does not appear in the enacted version of *N.J.S.A.* 34:15–8, the legislature did not intend that the "intentional wrong" exception be applied to employers; rather, the legislature chose to adopt a strict no-fault system whereby employers were required to make payment to all employees injured on the job without regard to fault, in exchange for total exclusivity of relief under the Compensation Act.

Plaintiffs, on the other hand, explain the co-employee focus of the "intentional wrong" exception not as a means to indicate that an employer's intentional wrongs are immune from common-law suits but rather as the legislature's specific response to judicial misinterpretation of statutory intent. Prior to the enactment of the 1961 amendment that added the "intentional wrong" exception to the exclusivity provision of the Compensa-

tion Act, corporate officers and co-employees were being found liable for their *negligent* actions that resulted in personal injuries to other employees. *See Stacy v. Greenberg,* 9 *N.J.* 390, 397 (1952); *Evans v. Rohrbach,* 35 *N.J.Super.* 260, 263 (App.Div.), certif. denied *sub nom. Evans v. Matthews,* 19 *N.J.* 362 (1955). The practical effect of allowing causes of action based on negligence to proceed against co-employees was that employers remained burdened with the weight of common-law damage judgments by reason of a legal or moral obligation to indemnify the defendant corporate officer or supervisory employee. *Miller v. Muscarelle,* 67 *N.J.Super.* 305, 321 (App.Div.), certif. den., 36 *N.J.* 140 (1961); *see Hagen v. Koerner,* 64 *N.J.* *Super.* 580 (App.Div.1960). Thus, in order to relieve employers of this unintended burden, the 1961 amendment, *L.* 1961, *c.* 2, was added to *N.J.S.A.* 34:15–8 to make clear that negligent actions of co-employees were compensated exclusively within the terms of the Compensation Act. In light of this need expressly to include a co-employee's *negligence* within the coverage of the Compensation Act, it was necessary to make clear that a co-employee's *intentional* wrongs were not subject to the exclusivity provision of the Act. Plaintiffs contend that no mention was made of the intentional wrongs of the employer because there was no need for any provision in the act to clarify this matter—intentional wrongs were never within the coverage of the Compensation Act. Because it was understood that the Compensation Act was never meant to be used as a shield to allow actors to harm employees with impunity, there was no need for the legislature to address the issue of employer intentional wrongs in the 1961 amendment.

We are convinced that the intentional wrongs of an employer as well as those of co-employees fall outside of the boundaries of the Compensation Act. Whenever, as here, the employer is a corporation, the employer can act only through its employees, so for practical purposes actions taken by certain corporate officers and supervisors are actions taken by the corporate-employer.

The allegations in these cases point up the fact that the acts of a co-employee are for practical purposes identical to the acts of his employer. Plaintiffs do not accuse the defendants-doctors of acting alone to inflict permanent injury on them; rather, the doctors are seen merely as employees who went along with whatever their employer wanted—tools in du Pont's corporate strategy to prevent workers from learning of their injuries. Without the crucial linchpin of du Pont's role in controlling its medical department, there is nothing in this regard to suggest that the defendant doctors planned to commit intentional wrongs against the plaintiffs. We therefore find that defendant-employer du Pont is subject to suit at common law for alleged intentional wrongs committed against plaintiffs-employees.

## VII

A final point to consider is how the doctrine of election of remedies affects a plaintiff asserting a cause of action under the "intentional wrong" exception of *N.J.S.A.* 34:15–8. Plaintiffs have filed workers' compensation claim petitions, and as noted *supra* at 169, defendants do not dispute that plaintiffs' injuries are compensable under the Compensation Act. The question arises, therefore, whether plaintiffs' pursuit of their compensation remedies acts as an election that bars their additional civil suit for intentional wrong.[4] See *Seltzer v. Isaacson*, 147 *N.J.Super.* 308 (App.Div.1977).

Precluding plaintiffs from a common-law cause of action for intentional wrongs because they have already chosen to seek the relief available under workers' compensation would be an unduly harsh and technical application of the election-of-remedies doctrine. The right to bring a common-law action for

---

[4]Although the record does not reveal whether compensation payments have already been made, whether plaintiffs have actually received their awards is irrelevant in light of our conclusion that plaintiffs are not barred by the election-of-remedies doctrine.

intentional wrongs beyond the intended scope of the Compensation Act would be a shallow right indeed if a claimant were forced to forfeit the recovery guaranteed by the Compensation Act in order to gamble on being able to prove that his injury was caused by the intentional wrong of his employer or co-employee. Plaintiffs who lose that gamble will be left totally uncompensated—even though it may be undisputed that those plaintiffs' injuries arose out of their employment—thus frustrating the Compensation Act's goal of providing security to workers who are disabled on the job.

██ Our view is that in light of the Compensation Act's purpose of assisting disabled workers, the best approach is to allow a plaintiff to process his workers' compensation claim without forfeiting the opportunity to establish that he was injured as a result of conduct that amounted to an intentional wrong, entitling him to seek damages beyond those available in workers' compensation. If, however, a plaintiff should prevail in his suit based on intentional wrong, he would not be entitled to keep the entire amount of his compensation award as well as his civil suit remedy. That double recovery is to be avoided is evident from so much of the Compensation Act as demands that compensation claimants who have recovered from third parties be required to reimburse their employer or its insurance carrier for compensation payments already made. *N.J.S.A.* 34:15–40. Thus if the trier-of-fact determines that du Pont and/or its doctors have been guilty of an intentional wrong as a result of their alleged fraudulent concealment of existing occupational diseases, du Pont or its insurance carrier will be able to offset compensation benefits previously paid to the extent that the civil damage award would serve as a double recovery.

Plaintiffs' pursuit of compensation benefits will not serve to preclude the common-law suit that we have recognized in this opinion. The existence of the Compensation Act as social legislation to aid disabled workers should not prevent these plaintiffs from attempting to establish that the actual cause of

their disabilities is an intentional wrong beyond the necessary risks of employment. To the extent that the Appellate Division opinion of *Seltzer v. Isaacson, supra,* 147 *N.J.Super.* 308, holds to the contrary, it is expressly overruled.

## VIII

As to so much of plaintiffs' complaints as seek damages for deliberate exposure to asbestos and to the risks associated with that exposure, we hold that those claims are compensable exclusively under the Compensation Act. They were dismissed by the trial court and the judgment of dismissal was affirmed by the Appellate Division. So much of the Appellate Division's judgment as embraces dismissal of the first count of the complaint is affirmed.

Plaintiffs have pleaded a valid cause of action in their second count as against du Pont and its physicians, based on an intentional wrong. The trial court dismissed that count as to du Pont but permitted it to stand as against the company doctors. The Appellate Division affirmed the dismissal as to du Pont and reversed the order denying summary judgment as to the doctors. Because we have concluded that the second count states a valid cause of action against both the employer and the physicians, we reverse so much of the Appellate Division judgment as encompasses plaintiffs' second count.

Affirmed in part, reversed in part. The cause is remanded to the Law Division for further proceedings consistent with this opinion.

HANDLER, J., concurring in part and dissenting.

In this case employees and former employees of E.I. du Pont de Nemours & Company (du Pont), suffering from painful and fatal asbestos engendered diseases, wish to bring common-law actions against du Pont and its physicians for intentional infliction of injuries. All the plaintiffs worked at various du Pont manufacturing plants in New Jersey for periods of twenty

years or more. The workers allege that during the course of their employment, their employer, du Pont, through the company physicians, "knew, or in the exercise of reasonable medical care should have known, of the dangers inherent in the use and exposure of plaintiffs to asbestos products, dust and fibers resulting from the use of said asbestos products." Plaintiffs further allege that du Pont "with full knowledge of the consequences of asbestos use and exposure, did by design, resolve, determination and thereby with intent directly conceal information of such life threatening use and/or exposure from the plaintiffs, thereby intentionally and willfully concealing from the plaintiffs the nature and extent of such dangers to their health." Plaintiffs' second count alleges that du Pont and its doctors "with deliberate intent to induce plaintiffs to continue to work under hazardous conditions, did conspire to and did fraudulently conceal from plaintiff[s] knowledge of diseases known by these defendants to be caused by ingestion of asbestos fibers and dust."

The defendants contend that plaintiffs' claims are barred because the Workers' Compensation Act provides the exclusive remedy for plaintiffs' occupational diseases. Defendants also argue that the *N.J.S.A.* 34:15-8 "intentional wrong" exception to the exclusiveness of the Workers' Compensation Act's remedy is not available because neither du Pont's nor du Pont's doctors' conduct as alleged amounts to a "deliberate intent" to harm plaintiffs.

The Court today recognizes that in order for an injured worker suffering from an occupation-related disease to bring a common-law action against his employer based upon "intentional wrong", thereby escaping the exclusivity provision of the Workers' Compensation Act under *N.J.S.A.* 34:15-8, the worker must prove that the employer's actions were "substantially certain" to cause the resultant disease. The Court also interprets the "intentional wrong" exception to the exclusive remedy of the Compensation Act as encompassing intentional wrongs committed by employers as well as a worker's co-employees.

I agree with these propositions of law. However, I think that the Court errs in applying its standard to the facts of this case. While the Court professes to endorse the "substantially certain" standard in construing the "intentional wrong" exception, its rejection of plaintiffs' common-law cause of action in the context of this case in effect requires that an employee demonstrate a much higher degree of knowledge on the part of the employer than "substantial certainty." The effect of the Court's decision is to impose a level of knowledge of resultant harm that is virtually akin to a showing of subjective intent or actual purpose to inflict injury. I take issue with the Court's application because, as I view the record, plaintiffs have presented a cause of action that genuinely and fairly raises the issue of whether or not defendants in this case possessed and concealed information indicating that exposure to asbestos was "substantially certain" to cause the occupational diseases that have debilitated the plaintiffs. I would thus reverse the lower court's disposition of plaintiffs' "initial intentional concealment and exposure" claims and permit that cause of action to proceed to a plenary trial.

The Court also upholds plaintiffs' claims against du Pont and its physicians for fraudulent failure to disclose the plaintiffs' contraction of asbestos engendered diseases and consequent aggravation of those diseases. I concur in the majority's disposition of this claim. However, I reiterate my view that the Legislature, in providing for co-employee immunity in the 1961 amendments to the Workers' Compensation Act, *N.J.S.A.* 34:15–8, did not intend to relieve company physicians of legal responsibility for their negligence or other tortious conduct. I would grant plaintiffs' an independent cause of action for a company doctor's malpractice consisting of professional negligence, as well as for fraudulent misconduct.

I.

In addressing plaintiffs' claims focusing upon the asserted intentional infliction of injuries, the majority embraces a "sub-

stantial certainty" test. It rejects the notion that in order to obtain remedial relief and redress beyond the narrow strictures of the Workers' Compensation Act the employees must prove du Pont and its doctors subjectively desired to harm its workers.

The subjective standard, which is disapproved by the Court, is not totally wanting in support. It is the so-called "narrow rule" endorsed by Professor Larson and the authorities cited by him. 2A *A. Larson, The Law of Workmen's Compensation,* § 68.13 at 13–22 to 13–27 (1983). *Ante* at 170–172. Professor Larson believes that in order for an act to lose its "accidental" quality and fall outside the exclusive remedy of Workers' Compensation the act must amount to a "deliberate infliction of harm comparable to an intentional left jab to the chin." *Id.* at 13–27. As noted by the Court, Professor Larson's test unsatisfactorily limits its scope to acts committed for the *purpose* of achieving certain consequences and ignores acts that are "only" *known* to produce certain consequences. Recognizing that "the Legislature could not have intended that the system of workers' compensation would insulate actors from liability outside the boundaries of the Act for all willful and flagrant misconduct short of deliberate assault and battery," *ante* at 177, the Court prudently rejects the "narrow rule" and incorporates "knowingly" committed acts within the definition of intentional wrong. *See also* Perlin, "The German and British Roots of American Workers' Compensation Systems: When is an 'Intentional Act' 'Intentional'?" 15 *Seton Hall L. Rev.* 849 (1985) (contending that British and German historical roots of the New Jersey Workers' Compensation system support a "broad" interpretation of the "intentional wrong" exception to the exclusivity of the Compensation Act's remedies).

Although the Court correctly discredits the "subjective desire" approach, it is difficult to discern from the Court's opinion any parameters or details of the standard it employs. In part, this conceptual ambiguity is attributable to the majority's extensive reference to authority that reflects much narrower

criteria for allowing a common-law cause of action. The Court adverts to *Bryan v. Jeffers*, 103 *N.J.Super.* 522 (App.Div.1968), and its state and federal progeny [1] despite that case's ruling that "intentional wrong" in the compensation statute means "deliberate intention" and excludes concepts of constructive intent. Similarly, the out-of-state cases cited by the Court either adopt a pure subjective-purpose test or concern complaints that did not allege the type of "knowledge" that the plaintiffs here allege. One case cited by the Court explicitly adopts and applies a subjective-purpose test, rejecting the plaintiff's complaint because the plaintiff did "not allege that the employer was motivated by a desire to harm him." *Burke v. Interlake, Inc.*, 600 *F.Supp.* 59, 61 (D.Conn.1984).

Moreover, other cases mentioned by the Court use a subjective-purpose standard, but, as *Bryan* and its progeny did, couch the standard as a "deliberate intent to injure." See *Prescott v. United States*, 523 *F.Supp.* 918, 928 (D.Nev.1981), aff'd, 731 *F.* 2d 1388 (9th Cir.1984) (under Nevada law, need "deliberate intent to kill"); *Houston v. Bechtel Assocs., Professional Corp.*, 522 *F.Supp.* 1094, 1096 (D.D.C.1981) ("nothing short of specific intent to injure" falls outside scope of Federal Workers' Compensation scheme, relying on Professor Larson's treatise); *Tysenn v. Johns-Manville Corp.*, 517 *F.Supp.* 1290, 1293 (E.D. Pa.1981) (refused to extend Pennsylvania's judicially-created intentional-tort exception beyond assault by an employer or other "deliberate, egregious conduct"); *Phifer v. Union Carbide Corp.*, 492 *F.Supp.* 483, 485 (E.D.Ark.1980) ("only if an employer commits acts with an actual, specific and deliberate intent to injure the employee will the employee have a common-law action in tort"). Another case found in the Court's opinion

---

[1] *Arcell v. Ashland Chemical Co.*, 152 *N.J.Super.* 471 (Law Div.1977), *Copeland v. Johns-Manville Products Corp.*, 492 *F.Supp.* 498 (D.N.J.1980), and *Petruska v. Johns-Manville*, 83 *F.R.D.* 39 (E.D.Pa.1979), cited ante at 170, all relied on *Jeffers* in finding the New Jersey Worker's Compensation Act to be the exclusive remedy for alleged intentional torts, and these cases are similarly repudiated by today's decision. *Ante* at 172.

employs a "substantial certainty" test, but involves a complaint that alleges intent only with respect to employer *actions,* and not with respect to *results.* See *Shearer v. Homestake Mining Co.,* 557 *F.Supp.* 549 (D.S.D.1983), aff'd, 727 *F.*2d 707 (8th Cir.1984) (no showing that defendant knew or believed ceiling would collapse as a result of violating safety standards). Finally, the Court points to *Kofron v. Amoco Chem. Corp.,* 441 *A.*2d 226 (Del.1982), where the Delaware Supreme Court refused to find any intentional tort-exception, including purposely-committed torts, to the Delaware Workers' Compensation Act's exclusivity provisions.[2]

The Court further obscures the meaning of its "substantial certainty" test by what appears to be an inconsistent assessment of the record in determining its sufficiency to support the causes of action set forth in plaintiffs' complaint. With respect to plaintiffs' claims alleging an *aggravation* of the disease based on fraudulent, conspirational concealment, the Court concludes that the record is evidentially sufficient to permit the issues to be submitted to a jury. However, with respect to the workers' claims alleging *initial* asbestos exposure with knowledge and concealment of the consequences, the Court apparently believes the record is insufficient to allow this cause of action to be tried. It seems, according to the Court's disposition, that knowledge of the degree of risk involved in inducing or allowing afflicted workers to continue working in poisonous plant atmosphere presents triable issues on the theory of conspiracy and fraudulent concealment. It is unclear why a triable issue is

---

[2]*Blade v. Anaconda Aluminum Co., Inc.,* 452 *N.E.*2d 1036 (Ind.Ct.App.1983), *ante* at 172, is admittedly more relevant to this case. In *Blade,* a plaintiff killed in a furnace explosion alleged that defendant knew that his failure to maintain and install certain safety devices on the furnace would result in a furnace explosion. An Indiana intermediate appellate court, quoting the "substantial certainty" definition of intent, determined that "no facts were alleged which would support an inference that [defendant] intentionally injured Mr. Blade." *Id.* at 1038. I nevertheless view *Blade* as distinguishable in that plaintiffs here have sufficiently alleged facts that would support an inference of knowledge of harm on duPont's part. See discussion *infra* at 195–198.

not also presented as to whether these same doctors, and thus du Pont, had knowledge to a substantial certainty associated with the initial asbestos exposure in the plants, aside from whether this knowledge reached the level of any specific intent or purpose to inflict harm, or fraud in concealing that harm.

Despite this entwinement between plaintiffs' intentional initial exposure and concealment claims and intentional- or fraudulent-aggravation claims based on subsequent or continuing exposure, the Court insists on treating the two sets of claims disparately, dismissing the former set of claims while allowing the latter set to go forward. Although the California Supreme Court made a similar distinction between initial exposure-concealment and aggravational exposure-concealment in *Johns-Manville Prods. Corp. v. Contra Costa Superior Court*, 27 *Cal.*3d 465, 612 *P.*2d 948, 165 *Cal.Rptr.* 858 (Cal.1980), that court's rulings were made against a completely different statutory background from that faced by this Court. A provision of the California workers' compensation statute specifically covers, and in fact provides an increased recovery for, an employer's "serious and willful" misconduct. The California Court found that when the California Legislature enacted this provision in 1917, it intended the provision to be a substitute for the pre-existing right of an employee to bring an action at common law for "serious and willful" conduct. *Id.*, 612 *P.*2d at 950, 951, 165 *Cal.Rptr.* at 860, 861. Thus, the California court's dismissal of the intentional exposure claim was not based on a failure to satisfy some "intent" standard, but on a provision of the California Code expressly including such claims within the workers' compensation scheme.[3] This Court, in mimicking the *Contra Costa* result, reaches an incorrect conclusion in this case, and blurs the contours of the "substantial certainty"

---

[3]The California Court upheld the cause of action for aggravational exposure by ruling, in effect, that willful aggravation of a work-related injury by a doctor is not the type of "hazard of employment" that comes within the exclusive purview of the compensation statute.

standard. The Court compounds this confusion by its affirmance of the summary dismissal of plaintiffs' claims without any focused attention to the details of plaintiffs' allegations or explication of the "substantial certainty" standard. A careful analysis of the "substantial certainty" standard and a conscientious application of that standard to plaintiffs' claims reveal why plaintiffs' claims should not be dismissed.

II.

The "substantial certainty" test adopted by the Court is *not* limited to instances of a subjective desire to harm. The Court explicitly states that its standard does not insulate employers from common-law liability for "all willful and flagrant misconduct short of deliberate assault and battery." *Ante* at 177. The *Restatement 2nd of Torts*, which the Court cites in support of its ruling, *ante* at 178, states:

> All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor *knows that the consequences are certain, or substantially certain, to result from his act*, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.
>
> [*Restatement 2nd of Torts*, § 8A, comment b. (emphasis added).]

The "substantial certainty" test thus imports into the concept of "intentional act" conduct undertaken with *knowledge* that certain consequences are "substantially certain" to occur.[4]

The claims dismissed by the Court allege just such knowledge. It is true that merely alleging deliberate acts, without raising a genuine issue as to defendant's "purposeful" or "knowing" state of mind with respect to those acts, will not survive a summary-judgment motion. But here plaintiffs' complaints allege that defendant du Pont exposed workers to asbestos "with full knowledge of the consequences" of such

---

[4]The New Jersey Criminal Code supports analogously this statutory understanding of "intent." Under the Code "purposeful," *i.e.* desired, and "knowing" homicides both satisfy the *mens rea* requirement for first degree murder. *See N.J.S.A.* 2C:11–3.

exposure. Read in its most favorable light as is required on a summary judgment motion, *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N.J.* 67, 73–75 (1954), plaintiffs' claims maintain that du Pont, through its doctors, knew with "substantial certainty" that the level of asbestos exposure in its plants would at some time produce the diseases that eventually did materialize. Nevertheless, the Court assumes that plaintiffs have alleged something less than "substantial certainty," even though at oral argument plaintiffs' counsel specifically endorsed the "substantial certainty" standard and thus implied that plaintiffs do indeed plan to meet a "substantial certainty" standard.

The Court's view of the record is unnecessarily and unfairly strict. The affidavits of du Pont's doctors deny only that the doctors subjectively desired to injure plaintiffs; they do not dispute or contradict plaintiffs' allegations respecting a claim under the "substantial certainty" standard. On the other hand, plaintiffs have already presented in the record one du Pont plant physician's deposition testimony that he learned of asbestos' dangers sometime between 1965 and 1976. Additionally, the record reveals that du Pont's Head of Pathology from 1958 to 1963 has stated in an unexecuted affidavit that during his tenure he did, on numerous occasions, in his professional and medical capacity, advise corporate medical officers of du Pont of the dangers and risk of employees' asbestos exposure.

Moreover, in order to prove du Pont's knowledge on these matters, plaintiffs are not limited to direct statements by du Pont personnel revealing their state of mind. With regard to proving intent, "it is correct to tell the jury that, relying on circumstantial evidence, they may infer that the actor's state of mind was the same as a reasonable person's state of mind would have been." *W. Prosser & W. Keeton, The Law of Torts*, § 8 at 36 (5th ed. 1984). The plaintiffs in this case could prove du Pont's knowledge by producing evidence with respect to the state of available medical knowledge of asbestos's dan-

gers over the years,[5] du Pont's previous experiences with workers exposed to asbestos, the concentrations of asbestos at the New Jersey plants, and other similar factors bearing on whether a reasonable doctor in the position of the du Pont doctors would have known that the conditions at the du Pont plants would be substantially certain to engender the ailments inflicted upon these plaintiffs.[6]   *Cf. Evers v. Dollinger,* 95 *N.J.*

---

[5]The first recognition of the hazards of asbestos exposure can be traced back to Pliny the Younger who some time in 61 to 114 A.D. is said to have commented on the sickness of slaves who worked with asbestos. *I.J. Selikoff and D.H.K. Lee, Asbestos and Disease,* at 20 (1978). The first significant scientific recognition of asbestos' dangers came in the 1920's in a British study of a case of asbestosis in a person who had worked for twenty years weaving asbestos textile products. *Cooke,* "Fibrosis of the Lungs Due to Inhalation of Asbestos Dust," 2 *Brit.Med.J.* 147 (1924); *Cooke,* "Pulmonary Asbestosis," 2 *Brit.Med.J.* 1024 (1927). In the 1930's, several more studies on the hazardous quality of asbestos were published. One researcher reported in 1936 that of 71 workers in his study who been dismissed from asbestos plants in North Carolina, 16 had slightly advanced, 35 moderately advanced, and 20 markedly advanced asbestosis. *Shull,* "Asbestosis: A roentgenologic review of 71 cases," *Radiology* 27, 279 (1936). The U.S. Public Health Service also commissioned a study on the effects of asbestos exposure. The resulting report published in 1938 fully documented the hazards of asbestos exposure, and recommended precautionary asbestos dust concentration levels. *Dreessen, et al., A Study of Asbestos in the Asbestos Textile Industry,* Public Health Bill No. 241 (1938) Research on asbestos continued in the 1950's and 60's. In 1965, Selikoff, Churg, and Hammond published a landmark study that conclusively linked the occurrence of pulmonary asbestosis with the duration of asbestos exposure. Selikoff, Churg, and Hammond, "The Occurrence of Asbestos Among Industrial Insulation Workers," 132 *Ann. New York Acad.Sc.* 139 (1965). The statutory culmination of the extensive medical studies on asbestos was the Occupational Safety and Health Act of 1970, 29 *U.S.C.* § 651 et seq., 84 Stat. 1590, which authorized the Secretary of Labor to establish standards for permissible concentrations of asbestos fibers. *See generally Borel v. Fibreboard Paper Prods. Corp.,* 493 *F.*2d 1076, 1083–1085 (5th Cir.1973), *cert. denied,* 419 *U.S.* 869, 95 *S.Ct.* 127, 42 *L.Ed.*2d 107 (1974) (tracing history of medical knowledge of asbestos-related occupational diseases).

[6]Defendant's awareness of asbestos' vicious effects may have become "substantially certain" at a time after plaintiffs began working at defendant's plant. In such a case, plaintiffs' claim should not be barred but should be circumscribed to the damage suffered for the period of employment during which defendant possessed its knowledge.

399 (1984) (plaintiff suffering from cancer can use expert medical testimony to show degree to which doctors negligence increased the risk of plaintiff contracting the cancer).

Despite these considerations, which demonstrate the availability of evidence and the existence of genuine issues of fact, the Court has affirmed defendants' partial summary judgment on this claim without any satisfactory analysis. Several ineluctable aspects of plaintiffs' proofs caution against granting du Pont summary judgment. The New Jersey Supreme Court, per Justice Brennan, observed in *Judson v. Peoples Bank & Trust Co. of Westfield, supra,* 17 *N.J.* at 76 that:

> Where * * * the opposing party * * * must probe the conscience of the moving party (or its officers, when, as here, a corporation) to prove his case, or in any case where the subjective elements of willfulness, intent or good faith of the moving party are material to the claim or defense of the opposing party, a conclusion from papers alone that palpably there exists no genuine issue of material fact will ordinarily be very difficult to sustain. * * * Indeed, subjective elements aside, a note of caution has been sounded as to any case where the opposing party must prove his claim or defense from what he can draw from the other party.

Later, in *Ruvolo v. American Cas. Co.,* 39 *N.J.* 490 (1963), the Court reiterated that

> where a case may rest upon opinion or expert testimony, a court should be particularly slow in granting summary judgment.... The same hesitancy should exist where the court is necessarily required to resolve questions of intent and mental capacity. Ordinarily in such situations justice is best served by plenary trial on the merits. And the need for caution is especially urgent where a party must rely for his case largely on what he can draw out of his adversary's witnesses.
>
> [*Id.* at 500 (citations omitted).]

The warnings against granting summary judgment expressed in *Judson* and *Ruvolo* apply with particular force to this case, where plaintiffs' proofs against a corporation derive in large part from doctors whose professional careers may be jeopardized by their adverse testimony. The Court has thus acted quite improvidently in dismissing plaintiffs' intentional-exposure and concealment claims. *See, e.g., Boudeloche v. Grow Chem. Casting Corp.,* 728 *F.*2d 759 (5th Cir.1984); *Blankenship*

*v. Cincinnati Milacron Chems., Inc.,* 69 *Ohio St.*2d 608, 433 *N.E.*2d 572, *cert. denied,* 459 *U.S.* 857, 103 *S.Ct.* 127, 74 *L.Ed.*2d 110 (1982).

There is added reason for consternation over the majority's abrupt dismissal of plaintiffs' intentional-exposure and concealment claims. Both courts below dismissed this claim by ruling that a worker could not sue an employer at common law for any work-related injury regardless of the employer's intent, a rationale that today's decision correctly repudiates. However, no further exploration or analysis of the evidence that could be marshaled to support this claim has been made. Thus, plaintiffs' important and very significant intentional-exposure and concealment claims will have passed through three levels of the New Jersey judiciary without any thorough consideration of their merits. These claims deserve better treatment. Where complicated issues with farreaching effects are involved, a Court should exercise caution in granting summary judgment without an adequately developed record. *See Jackson v. Muhlenberg Hosp.,* 53 *N.J.* 138 (1969).

Finally, the public policy of this State, as most recently expressed by the Legislature in the "Worker and Community Right to Know" Act, *N.J.S.A.* 34:5A–1 to –31, supports the conclusion that the intentional-tort exception to the exclusivity of the Workers' Compensation remedy includes both initial and aggravated concealment of known dangers from hazardous substances such as asbestos. This statute states that

> [t]he Legislature finds and declares that the proliferation of hazardous substances in the environment poses a growing threat to the public health, safety, and welfare; ... and that individuals have an *inherent right* to know the full range of the risks they face so that they can make reasoned decisions and take informed action concerning their employment and their living conditions.
> [*N.J.S.A.* 34:5A–2 (emphasis added).]

To effectuate the purposes of the "Right to Know Act" employers are required to submit to the Department of Health a survey of the hazardous materials present in the work place environment, *N.J.S.A.* 34:5A–7, and to educate and inform their employees about these substances. *N.J.S.A.* 34:5A–13. The majority believes that the Legislature in enacting the "Right to

Know Act" made "a studied decision to address the problems associated with hazardous substances in the workplace in some manner other than simply expanding the system of worker's compensation." *Ante* at 181. However, the majority does not refer to any legislative history or findings to support its naked conclusion that the "Right to Know Act" was intended as the exclusive hazardous substance "remedy." A more reasoned view is that the "Right to Know Act" furnishes an additional avenue of protection, supplementing those available under the Workers Compensation Act and the basic common law. *See Lally v. Copygraphic*, 85 *N.J.* 668 (1981) (worker alleging retaliatory firing attributable to the filing of a workers' compensation claim has a common-law right of action for wrongful discharge in addition to the penal and administrative remedies provided by the Workers' Compensation Act). The underlying standard of conduct prescribed by the "Right to Know Act" is disclosure to the public and to workers of the presence of known hazardous substances. Recognition that the intentional-tort exception of *N.J.S.A.* 34:15–8 confers an independent common-law cause of action for the concealment of known hazardous substances clearly effectuates the goals and policies of the "Right to Know Act."

In reaching its disposition of plaintiffs' intentional initial-exposure and concealment claims, the Court is quite properly concerned with the "intentional wrong" exception swallowing up the general rule that Worker's Compensation is the exclusive remedy for work-related injuries. *Ante* at 177. However, a favorable disposition of plaintiffs' intentional initial-exposure and concealment claims will not result in a deluge of similar claims, nor undermine the "occupational disease" coverage of the Compensation statute. As with their intentional aggravation claim, plaintiffs still would have a very substantial burden to meet in proving their claims of intentional exposure. In view of the difficulty of this task, many workers may prefer their Workers Compensation remedy and its accompanying convenience and ease of proof. However, the odds against an injured

worker's eventual success do not justify a denial of a cause of action altogether. *See Ruvolo v. American Cas. Co., supra,* 39 *N.J.* at 501. The Legislature has decided that under certain narrow circumstances an injured worker's remedy does not lie exclusively in the Workers' Compensation insurance scheme. Fairness and justice dictate that those workers who may meet the Legislature's criteria be given the opportunity to prove it.

Naturally, the disposition of each complaint and allegation under the "substantial certainty" test is "case" specific, depending on the facts. On these facts, however, I think plaintiffs have presented a genuine issue as to defendant's knowledge of the consequences of exposure to asbestos. I would thus remand for a full trial on that issue.

### III.

In contrast to its disposition of plaintiffs' first claim, the Court denies defendants' summary judgment with respect to plaintiffs' additional claims and holds that "plaintiffs' allegations that defendants fraudulently concealed knowledge of already-contracted diseases are sufficient to state a cause of action for aggravation of plaintiffs' illnesses." While I agree with this ruling, I also think that doctors should not enjoy co-employee immunity under the Workers' Compensation Act since they owe an independent duty to plaintiffs as patients, and consequently should be held independently liable for their negligently-performed services. I accordingly dissent from so much of the Court's ruling as brings doctors employed by du Pont within the protective umbrella of the Compensation Act's co-employee immunity. In dissenting from this portion of the Court's ruling, I rely substantially on my dissenting opinion in *Boyle v. Breme,* 93 *N.J.* 569, 570 (1983). I take this opportunity to add one more objection to granting company physicians this immunity.

Doctors, in contrast to other "co-employees," owe to the workers they treat an independent duty that originates outside

of the employment relationship. Medical practitioners, licensed by the State, owe prime responsibility to the public to uphold their sworn oaths as healers. Any duty owed to an employer or co-employee as a co-employee is necessarily of a secondary nature.

> Employees who are professionals owe a special duty to abide not only by federal and state law, but also by the recognized codes of ethics of their professions. That duty may oblige them to decline to perform acts required by their employers.
>
> [*Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58 (1980).]

This Court should not interpret a statute as immunizing a doctor's breach of that primary and special duty absent a clear expression by the Legislature that it intended the statute to have that effect.

In enacting the 1961 amendments to *N.J.S.A.* 34:15–8 granting co-employees immunity for negligent acts, the Legislature did not express or effectuate an intention to include doctors within the scope of that privilege. Indeed, granting doctors "co-employee immunity" does not further the underlying purpose of the 1961 amendment, but does undermine New Jersey's public policy in deterring negligent conduct and fully compensating negligently-inflicted injuries. The "co-employee immunity" amendment was designed to abolish "cause[s] of action in tort against a fellow employee ... [that] ha[d] frequently resulted in burdening the employer indirectly with common law damages superimposed upon workmen's compensation liability by reason of either a legal, moral or practical obligation to indemnify the sued ... employee." *Miller v. Muscarelle*, 67 *N.J.Super.* 305, 321 (App.Div.1961). Allowing recovery against employers through *respondeat superior* undermined the Worker's Compensation system's function as the exclusive remedy for most work-related accidents, and more particularly as the exclusive source of liability for employers for most work-related injuries.

However, the *respondeat superior* doctrine, which spawned the 1961 amendments, would not apply to doctors. "The rela-

tionship between an employer and a company physician differs substantially from other employer-employee relationships to which the doctrine of master/servant would apply. Rather than directing and supervising the doctor's work, the employer lacks control over the medical, patient-treating aspects of its house physician's work." *Boyle v. Breme, supra,* 93 *N.J.* at 573 (Handler, J., dissenting). While it is not the only point of inquiry, the extent of employer control over an employee's employment responsibilities is a crucial element in the creation of a master-servant relationship. *See Restatement 2nd of Agency,* § 2; *see also Pelliccioni v. Schuyler Packing Co.,* 140 *N.J.Super.* 190, 199 (App.Div.1976) (although element of control is not the be-all and end-all of ascertaining whether a master and servant relationship exists and each case must be determined on its own facts, it is generally the most important element). Other important factors employed in the calculus of the master-servant determination include the distinctiveness of the employee's occupation and the degree of specialized skill inherent in the employee's daily duties. Finally, in deciphering an employment situation, a court will also look at the identity of the party supplying the equipment, the length of employment, the method of payment, the subjective beliefs of the actors, and whether or not the employee's work is part of the employer's regular business. *See Restatement 2nd of Agency,* §§ 2, 220; *Miklos v. Liberty Coach Co.,* 48 *N.J.Super.* 591, 602 (App.Div. 1958). In this case of doctors employed by companies, the lack of employer control and direction, the medical profession's skill and distinct occupational personality, and the fact that medical services are not a product marketed by du Pont militate strongly towards viewing doctors as independent contractors. *Cf. Tutino v. Ford Motor Co.,* 111 *N.J.L.* 435 (C. & E. 1933) (employer not liable for injury to worker caused by negligence of physician and nurse whom employer employed). *But cf. Rutherford v. Modern Transp. Co.,* 128 *N.J.Super.* 504 (Law Div.1974) (plaintiff truck driver could not maintain a separate negligence cause of action as an independent contractor be-

cause the economic situation, in which plaintiff received all work and pay from defendant despite being "employed" by another company, made him an employee of defendant for purposes of Workers' Compensation statute).

Since employers would not be liable for the negligence of the doctors they employ, applying the co-employee immunity to company physicians does not comport with the underlying purpose of the 1961 amendments in protecting employers from double liability. No public policy is advanced by including doctors within *N.J.S.A.* 34:15–8's co-employee immunity. On the other hand, the *Boyle* rule perniciously allows company-employed physicians to operate undeterred at a level of performance beneath that which is expected of other members of the medical profession at the expense of workers' lives and limbs.

## IV.

In conclusion, I concur with the Court's holding that employers may be sued at common law for "intentional wrongs" and that conduct undertaken with knowledge to a substantial certainty that harm to workers will occur is the appropriate standard in defining an "intentional wrong." Under that standard plaintiffs have stated a valid cause of action for intentional aggravation of their diseases.

In my view plaintiffs have also presented meritorious claims based on intentional initial exposure to asbestos. I believe that plaintiffs' complaints in the context of the record before us present a valid cause of action concerning du Pont's knowledge that exposure to asbestos would be substantially certain to result in disease. I therefore dissent from the Court's dismissal of these claims.

I am also of the view that plaintiffs should be accorded an independent cause of action for du Pont's physicians' negligent malpractice. I therefore concur in the result, if not the reasoning, of the Court with respect to plaintiffs' claims against the defendant-physicians.

Accordingly, I would remand the case for trial on both these issues.

*For affirmance in part; reversal in part and remandment* —Justices CLIFFORD, SCHREIBER, POLLOCK, JACOBS and SULLIVAN—5.

*Concurring in part; dissenting in part* —Justices HANDLER and O'HERN—2.