248 N.J. Super. 492 (1991)
591 A.2d 694
RAUL E. BUSTAMANTE AND YOLANDA BUSTAMANTE, HIS WIFE, PLAINTIFFS-RESPONDENTS,
v.
PAUL TULIANO, DEFENDANT-APPELLANT, AND THE TOWNSHIP OF PEMBERTON, DEFENDANT-RESPONDENT, AND EDWARD CARMEN, WILLIAM HANN, BUD FIFIELD, AND JOHN DOE(S), FICTITIOUS NAME(S), DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 10, 1991.
Decided June 6, 1991.
*493 Before Judges KING, LONG and STERN.
Robert B. Kugler argued the cause for appellant (Moss, Powers & Kugler, attorneys; Robert B. Kugler, on the brief).
Philip T. Ciprietti argued the cause for respondents Bustamante.
Stacy L. Moore, Jr. argued the cause for respondent Township of Pemberton (Parker, McCay & Criscuolo, attorneys; Stacy L. Moore, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
Plaintiff Raul Bustamante lost the sight in his left eye when he was struck by a wax bullet during training exercises of Pemberton Township Emergency Response Team (ERT). After accepting workers' compensation benefits, Bustamante filed a complaint against the Township of Pemberton and his fellow officer, Paul Tuliano, pursuant to N.J.S.A. 34:15-8 in which he contended that Tuliano intentionally shot him during the training *494 exercises.[1] After a trial during which the Township was dismissed, the jury found that Tuliano had intentionally injured Bustamante and accordingly awarded him damages. The trial judge entered judgment on the jury verdict. Tuliano moved for a new trial or, alternatively, for judgment notwithstanding the verdict, which motions were denied.
Tuliano appeals, claiming that there was no evidence to support the jury verdict that he committed an intentional wrong, and that he should have been dismissed at the close of Bustamante's case or at the end of trial. We agree that the case should not have gone to the jury, that the acts committed by Tuliano did not rise to the level of an intentional wrong, and that Bustamante was thus limited to the workers' compensation remedy. Thus, we reverse.
The facts adduced at trial are as follows: Following a number of township emergencies, the Township of Pemberton recruited volunteers from among members of the police department to staff an ERT. The members were to develop physical skills and abilities with firearms to deal with special police situations such as mentally ill offenders, barricaded suspects and persons with weapons. Bustamante volunteered and became a member of the first ERT team, which was headed by Tuliano.
In April or May 1984, the six members of the first ERT team went to Picatinny Arsenal for special training by the U.S. Defense Department Police Department. At Picatinny, the officers participated in exercises with rubber bullets, which were used because they left a hole or indentation on the paper targets so that participants could see where their shots hit. Bustamante testified at trial that he never used wax bullets at Picatinny and stated that he was aware of no instructions or *495 even discussion about using wax bullets while he attended the training there.
The Pemberton Police Department required the ERT teams to train monthly following their return. These sessions were in addition to regular police department shifts. An ERT member who was assigned to duty and couldn't find a substitute was unable to attend training. Because the Township did not give the teams sufficient money to buy rubber bullets, participants began to manufacture wax bullets. These bullets were made of hard beeswax that did not ricochet or deform, but disintegrated upon hitting a barrier. Bustamante testified that wax bullets were used because they made "the noise of a real bullet" and because team members considered it important that the person "shot" could not deny being hit. According to Bustamante, if you had been hit by a wax bullet, "you [knew] you'[d] been hit." Wax bullets had hit ERT team members in prior exercises. Bustamante himself had previously shot Sergeant Bud Fifield in the leg while the teams were "horsing around." Following that incident, Fifield gathered the team members and instructed them to discontinue horsing around because someone could be hurt.
On February 19, 1985, the ERT teams convened at a municipal beach facility in Browns Mills called the BMIA building. Team members obtained wax bullets for their pistols from the ERT van. After exercises outside the building, it was determined that the teams would clear the building of two "bad guys." Bustamante and Fifield volunteered to play these parts. The BMIA building is a multi-purpose recreational facility with a stage and movable chairs that can be set up as a theater or used for other purposes. Bustamante testified that Fifield hid in an upstairs kitchen, while he crouched on top of an air conditioning duct suspended above the stage. The teams found Fifield quickly. Bustamante testified that Tuliano then snuck towards the stage with his weapon in "port arms" position, that is, ready to fire. When Tuliano was 15 to 19 feet from Bustamante, Bustamante fired his weapon against the *496 wall, hitting it about ten feet from Tuliano. Tuliano then shot back at Bustamante, hitting him in the eye.
Officer David Patriarca, who was also involved in the exercise, testified for the plaintiff and denied firing at Bustamante, claiming he didn't even know where Bustamante was until the exercise ended. Patriarca recalled hearing "a couple shots" when Bustamante was hit but couldn't remember how many shots had been fired.
After the team first-aider determined that Bustamante had to be taken to the hospital, Fifield drove there in an unmarked detective's car, and Tuliano rode along to keep Bustamante alert so that he would not go into shock. Bustamante testified that Fifield and Tuliano initially discussed telling the hospital that Bustamante had hit his own eye on a portion of the air conditioner. Bustamante agreed to do so. However, according to Bustamante, when the three arrived at the hospital, Fifield and Tuliano decided to tell the truth that Bustamante had been shot in the eye with a wax bullet. Bustamante recalled that during the trip to the hospital, Tuliano told him he was sorry, and that he had only meant to "sting" Bustamante so that Bustamante would know he had been hit. Bustamante testified that he did not believe Tuliano intended to hurt him.
Tuliano testified in defense that in addition to rubber bullets, the first ERT team used wax bullets which were introduced by another police department who was also training at the Picatinny Arsenal. Tuliano testified that the only reason why wax bullets were used was because their sound was much more realistic than blanks. Although he had not been hit by a wax bullet himself, Tuliano understood that it felt like being hit by a BB. Tuliano stated that he had never fired a wax bullet at anyone.
As to the events of February 19, 1985, Tuliano testified that he and Patriarca simultaneously approached the stage from opposite sides. Following Bustamante's shot, Tuliano fired up, but away from Bustamante. At the same time, Tuliano heard a *497 volley of rounds throughout the room. Tuliano described everything as happening in a "split second" and said he knew he fired in a split second because once you identify the target, you must immediately take action. He also stated that when he shot, his gun was pointing up, in a natural reaction to being shot at from above. He testified that he saw Bustamante before he fired the shot and fired away from him. Tuliano was highly trained with firearms. He testified that at 10 to 12 feet, he could put all ten shots into a circle the same diameter as a pencil.
Fifield's investigative report stated that Tuliano told Fifield that Tuliano's wax bullet hit Bustamante. Tuliano dismissed the Fifield report as being prepared solely as a way for Fifield to protect himself, but Fifield testified, as a rebuttal witness, that he had accurately tried to reflect his understanding of the incident when requested to investigate it. Fifield acknowledged that his report also stated that Bustamante told Fifield that both Tuliano and Patriarca were sneaking up on the stage and that Bustamante had first shot at Patriarca before he got hit. Bustamante testified on rebuttal that he never made this statement to Fifield and that, in fact, he "didn't even know that Patriarca was there when [he] fired the first shot to Sergeant Tuliano." He also stated that he understood that the purpose of the wax cartridges was "[t]o hit the target" which was not a human being because, as he stated, "we were told not to hit ourselves."
Correspondence from Dr. James G. Nachbar confirmed that as a result of the incident, Bustamante had permanently lost the vision in his left eye. The jury returned a verdict in Bustamante's favor. This appeal followed.
N.J.S.A. 34:15-8, which is the basis for this action, provides in pertinent part:
If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.
*498 It is undisputed that Bustamante qualified for and received workers' compensation benefits. The controversy here is whether the Legislature intended that the Workers' Compensation Act would serve as his sole and exclusive remedy under the facts proved at trial. We think it did.
The term "intentional wrong" as used in N.J.S.A. 34:15-8 is a narrowly defined concept. It requires a showing of deliberate intention to injure. Copeland v. Johns-Manville Prods. Corp., 492 F. Supp. 498, 501 (D.N.J. 1980); Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 170, 501 A.2d 505 (1985); Bryan v. Jeffers, 103 N.J. Super. 522, 523-24, 248 A.2d 129 (App.Div. 1968), certif. denied, 53 N.J. 581, 252 A.2d 157 (1969); Arcell v. Ashland Chem. Co., 152 N.J. Super. 471, 495-96, 378 A.2d 53 (Law Div. 1977). In Millison, the Supreme Court pointed out that other jurisdictions are consistent on this issue and that
although different jurisdictions may craft different formulations, whatever formulation is used represents a conscious effort to impose severe restrictions on the exception, bringing it as close to "subjective desire to injure" as the nuances of language will permit, while at the same time recognizing the problems of proof inherent in any attempt to demonstrate subjective intent.
101 N.J. at 173, 501 A.2d 505.[2] This narrow focus protects against the intentional wrong exception swallowing up the *499 exclusivity provision of the Workers' Compensation Act. Id. at 177, 501 A.2d 505.
The Supreme Court in Millison cited the intentional wrong analysis advanced by Dean Prosser and echoed in the Restatement of Torts:
[T]he mere knowledge and appreciation of a risk  something short of substantial certainty  is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong.
Id. at 177, 501 A.2d 505 (quoting W. Prosser and W. Keeton, The Law of Torts, § 8 at 36 (5th ed. 1984) and citing Restatement (Second) of Torts § 8A (1965)).
The Court adopted the substantial certainty test and indeed denominated the requirement in an intentional wrong case as "virtual certainty" that the consequences will occur. Id. at 178, 501 A.2d 505 (citations omitted). Further, the Court stated:
It may help to perceive "substantial certainty" not so much as a substantive test itself nor as a substitute for a subjective desire to injure, [but] as a specie of evidence that will satisfy the requirement of cases such as Bryan v. Jeffers, *500 supra, 103 N.J. Super. at 523-24 [248 A.2d 129], that "deliberate intention" be shown.
Id. In order to determine whether an actor intended the harm his act produced, a court must examine the conduct of the actor and also the context in which the injury occurred:
[M]ay the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the Legislature could have contemplated as entitling the employee to recover only under the Compensation Act?
Id. at 179, 501 A.2d 505 (emphasis in original).
Analyzed under these tests, it is clear to us that Bustamante's case should not have gone to the jury. Accepting as true all the evidence supporting his position, and according him the benefit of all legitimate inferences, as a matter of law, he did not establish an intentional wrong. R. 4:40-1; R. 4:37-2(b).
We turn first to the context of the injury. It seems to us that the staffing of an ERT with police volunteers with a focus on weaponry to address the problem of armed and mentally ill offenders is a fact of life of police employment and plainly within the legislative contemplation of the Workers' Compensation Act. Indeed, the officers were being trained to do the very thing Tuliano did.
More importantly, the focus of Bustamante's case against Tuliano was that Tuliano admitted that he shot at Bustamante during the exercise to "sting him" with a wax bullet so that he would know that he had been hit. This, according to Bustamante, supplies the requisite intent to injure. On the contrary, we agree with Tuliano that the intent to "sting" falls far short of the required intent to injure. Indeed, what was involved here was nothing more than an intent to let the victim know he had been hit. The "sting" of the wax bullet was analogous to the use of a paint bullet. Its purpose was not to injure but to serve as evidence that the "victim" could no longer participate. Elimination of the victim was the point of the exercise. The suggestion that Tuliano intended or expected some injury to *501 Bustamante is simply not supported by this record. This injury was surely accidental.
But even if this were not so and it could be said that Tuliano understood that shooting wax bullets was risky to others, his actions do not warrant an exception from the workers' compensation bar. Neither negligence nor recklessness will suffice. The bar will fall only in the face of proof of a subjective intent to injure or a substantial certainty that injury will occur. No such proof was presented here.
Reversed.
NOTES
[1] The complaint also named several fellow officers whom plaintiff claimed were directing the training exercises. These parties were dismissed during trial.
[2] We note that since the Supreme Court's decision in Millison, other jurisdictions have continued to impose severe restrictions on the exception. See, e.g., Lawton v. Alpine Engineered Products, Inc., 498 So.2d 879 (Fla. 1986) (allegations that employer instructed employee to operate punch press without informing him of known hazards and providing point of operation guards were insufficient to prove that employer deliberately intended to injure or was substantially certain that the result would occur; substantial certainty requires more than "a strong probability of injury"; it requires "virtual certainty"); Burt v. Dunham-Price, Inc., 549 So.2d 912 (La. Ct. App.), cert. denied, 552 So.2d 402 (1989) (the actor must consciously desire the physical result of his act or know that the result is substantially certain, "inevitable or incapable of failing," to occur; allegations that corporation and its employee in referring security guard to construction company for employment and supplying him with shells for his shotgun were not sufficient to prove that the injuries received during labor violence were substantially certain to occur; the job was one that entailed certain risks); Adsem v. Roske, 224 Mont. 269, 728 P.2d 1352 (1986) (exception requires that the harm alleged must have been "maliciously and specifically directed at the employee").

Several jurisdictions have amended their statutes to reflect the developing need to define what is meant by an intentional act. See, e.g., Handley v. Union Carbide Corp., 804 F.2d 265 (4th Cir.1986) (recognizing that the West Virginia amended statute requires that a "consciously, subjectively and deliberately formed intention to produce the specific result of injury" must be proven); McNees v. Cedar Springs Stamping Co., 184 Mich. App. 101, 457 N.W.2d 68 (Ct.App. 1990) (amended Michigan statute provides that an employer is deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge); Kunkler v. Goodyear Tire & Rubber Co., 36 Ohio St.3d 135, 522 N.E.2d 477 (1988) (recognizing that the Ohio statute now defines the elements of an intentional tort committed by an employer upon an employee utilizing the "substantially certain" standard which is defined in the statute as a "deliberate intent"). See also Kohler v. McCrory Stores, 395 Pa.Super. 188, 576 A.2d 1107 (Super.Ct. 1990), cert. granted, ___ Pa. ___, 588 A.2d 510 (Pa. 1991) (Pennsylvania's exception requires that the injury was "caused by an act of a third person [intending] to injure the employee because of reasons personal to him").