

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-28-1996

# Subbe-Hirt v. Baccigalupi

Precedential or Non-Precedential:

Docket 95-5786

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Subbe-Hirt v. Baccigalupi" (1996). *1996 Decisions.* Paper 93.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/93

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5786


ELAINE J. SUBBE-HIRT,

                    Appellant

                    v.

ROBERT BACCIGALUPI; PRUDENTIAL INSURANCE COMPANY,

                    Appellees


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW JERSEY
            (D.C. Civ. No. 91-02813)


Argued June 4, 1996

Before: COWEN, NYGAARD, AND LEWIS, Circuit Judges

(Opinion Filed August 28, 1996)

                        Donald J. Maizysm, Esq.
                        (Argued)
                        Karas, Kilstein, Hirschklau,
                        Feitlin & Youngman
                        9-10 Saddle River Road
                        Fair Lawn, New Jersey 07410

                        Attorney for Appellant

                        M. Elaine Jacoby, Esq.
                        T. Gary Mitchell, Esq.
                        (Argued)
                        Hill Wallack
                        202 Carnegie Center
                        Princeton, New Jersey 08543

                        Attorneys for Appellees

                        _____


                    OPINION OF THE COURT
                        _____

Nygaard, Circuit Judge.

                                   I.

     Appellant Elaine Subbe-Hirt brought this action against her
former employer, Prudential Insurance Company, and Robert
Baccigalupi, her former supervisor at Prudential, presenting
several claims arising out of her employment with Prudential.
The district court granted summary judgment in favor of the
defendants on Subbe-Hirt's claim for intentional infliction of
emotional distress.  It held alternatively that her claim was
barred by the exclusive remedy provided by the New Jersey
Worker's Compensation Act and that, in any event, the claim would
fail on its merits because defendants' conduct was not
sufficiently outrageous under New Jersey law.  Subbe-Hirt appeals
from that ruling.
                                   II.
     The district court applied a "substantially certain"
standard to appellant's claim for intentional infliction of
emotional distress; it then found that defendant's conduct did
not meet the threshold level sufficient to support a cause of
action for an intentional tort, thereby avoiding the exclusivity
provisions of the New Jersey Workers' Compensation Act.  This was
incorrect as a matter of law.
     The district court viewed the applicable legal standard as
follows:
          In order for an employee to bring an action against his
          or her employer based upon an "intentional wrong",
          thereby escaping the exclusivity of the WCA, the worker
          must prove that the employer's actions were
          "substantially certain" to cause the alleged harm.

The New Jersey Supreme Court, however, has required only that a
plaintiff show deliberate intention to avoid the exclusive remedy
provided by the Compensation Act.  See Millison v. E.I. du Pont
de Nemours & Co., 501 A.2d 505, 514 (N.J. 1985).  The Millisoncourt cited
the Restatement (Second) of Torts § 8A to elucidate
its definition of intent, opining in a parenthetical reference
that the "meaning of intent is that actor desires to cause
consequences of his act or is substantially certain that such
consequences will result from his actions." Id. at 514 (emphasis
added).
     Although the Millison court did adopt a "substantial
certainty" standard, the district court failed to apply the full
Millison test, under which deliberate intent can be proven by
either: 1) a desire to cause the consequences of an act; or 2)
substantial certainty that those consequences will result.
     Proving that the defendant desired to cause consequences of
its act is both the most direct and usually the most difficult
way to show deliberate intent to harm.  The Millison court,
although focusing on substantial certainty, did not reject this
more direct means of proving deliberate intention:
          It may help to perceive "substantial certainty" not so

much as a substantive test itself nor as a substitute for a subjective desire to injure, as a specie of evidence that will satisfy the requirement . . . that "deliberate intention" be shown.

Id. at 514 (citation omitted); accord New Jersey Mfrs. Ins. Co. v. Joseph Oat Corp., 670 A.2d 1071, 1074 (N.J.Super. 1995) (the Millison court "did no more than explain that such deliberate intent to injure can be proved not only by evidence of actual subjective intent to injure, but also by circumstances where injury is a substantial or virtual certainty"); Hambsch v. Harrsch, 606 A.2d 879, 883 (N.J. Super. 1991) ("Millison and its offspring have skillfully devised a standard based upon either a 'substantial certainty' to injure or the defendant's actual subjective intent to injure."); Bustamante v. Tuliano, 591 A.2d 694, 699 (N.J. Super. 1991) ("The bar will fall only in the face of proof of a subjective intent to injure or a substantial certainty that injury will occur."). Because the district court erroneously applied only a substantial certainty test and because, as we explain infra, the record contains sufficient evidence of direct intent to injure, we hold that the Act does not bar appellant's intentional infliction claim.

### III.

Subbe-Hirt contends that the district court also committed legal error by basing its summary judgment on a conclusion that defendants' conduct was not sufficiently outrageous to support a claim for intentional infliction of emotional distress. On this allegation of error we have but two issues to decide: 1) whether Robert Baccigalupi intended to inflict emotional distress upon Elaine Subbe-Hirt; and 2) whether the evidence supports appellant's contention that Baccigalupi succeeded in inflicting that distress. We answer both questions in the affirmative and hold that the record in this case exceeds a threshold showing of outrageous behavior sufficient to preclude summary judgment.

### A.

The present record, when viewed in the light most favorable to Subbe-Hirt, shows that Robert Baccigalupi unquestionably intended to inflict emotional distress upon Elaine Subbe-Hirt. According to sales manager Mark Parisi, Baccigalupi "would berate [Subbe-Hirt] or talk about getting her." Indeed, Baccigalupi stated, "I'm going to get her."

Moreover, according to the deposition testimony of Parisi and sales manager Robert LaNicca, Baccigalupi stated, in the presence of other managers and on more than one occasion, that he "was going to trim her bush;" a blatantly sexist metaphor to brag of how Baccigalupi would handle females in general and Subbe-Hirt in particular. According to sales manager David Meyer, "when it was brought to R. Baccigalupi's attention that [Subbe-Hirt] was soon going to be returning from disability, R. Baccigalupi quickly remarked, 'Well, don't worry about her. I'm going to trim her bush.'" When asked by counsel to explain what he understood Baccigalupi's remark to mean, Meyer testified, "I understood it that he was going to lay into her quite hard and put her in her place." LaNicca said that on another occasion

Baccigalupi stated, "Let's bring Elaine in here on Friday and we'll trim her bush."  Parisi understood that phrase to mean:

> That he was going to come down on her, whatever his particular style was, forcing her to either go out on disability or leave the company or to cease the union activity. . . .  [This] is, unfortunately with Prudential, is an avenue that agents take when they can't take the -- you know, when management pressure goes up, and that's what [Baccigalupi] might use that for."

Likewise, Robert King, a district agent, said:

> There came a point in time where it was almost embarrassing for many of us to watch a woman being -- . . . it was pretty much obvious that Elaine wouldn't and couldn't bear up under the general atmosphere . . . -- her time was expiring. . . .  We talked amongst ourselves that, you know, this was a critical stage . . . .  There was a persecution going of myself and Elaine, and Elaine in particular. . . .  [Baccigalupi said] more or less than [sic] she was history and that if I intended to continue that I would -- I should leave things go as they are going.

Baccigalupi's intent to inflict emotional distress can be further seen in his total lack of any vestige of compassion for any woman in the office.  On one occasion Meyer told Baccigalupi that he "couldn't continue performing 'root canal' on women agents on his staff because they broke down in tears."  At that point, Baccigalupi simply selected a woman agent to abuse as a demonstration, saying "Well, don't worry.  I'll show you how to handle it."  Appellant describes this contrived encounter as follows:

> He then called one of the women agents in for a review, and started the 'root canal' and the intimidation on her until she broke down and started crying.  R. Baccigalupi kept tearing and pressing into her and when it was over and she had left the office, he was holding out his suspender straps as if to say, "this is how you handle it; don't let their emotions get in your way."

Indeed, Baccigalupi admitted his intent when he said to Subbe-Hirt, "do you know who Joan of Arc is, read between the lines, do you know why I'm looking at your work so closely, do you think I do this to everyone?"

We have no difficulty in concluding that a reasonable jury could find from this evidence that Baccigalupi intended that his conduct subject Elaine Subbe-Hirt to emotional distress, and will turn next to whether Baccigalupi's conduct had its intended effect, and whether that effect was sufficient as a matter of law to state a claim of intentional infliction.

B.

1.

The district court erred when it held that Subbe-Hirt did not allege, nor did the record on summary judgment show, conduct

sufficiently outrageous to state a claim that Baccigalupi had intentionally inflicted emotional distress upon her. In Buckley v. Trenton Sav. Fund Soc'y, 544 A.2d 857, 863-64 (N.J. 1988) the New Jersey Supreme Court applied the view of the Restatement (Second) of Torts § 46 to the tort of intentional infliction. The district court was therefore correct that, under New Jersey law, intentional infliction of emotional distress comprehends conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 comment d. We disagree, however, with the district court's conclusion that Baccigalupi's conduct was not sufficiently outrageous, and are led inexorably to the conclusion that summary judgment should have been denied.

2.

Elaine Subbe-Hirt began working for Prudential Insurance Company as an insurance salesperson in 1984. Initially, she reported to a sales manager, who reported to defendant Robert Baccigalupi, the District Manager for the office. When the sales manager to whom she reported left the company, Subbe-Hirt found herself reporting directly to Baccigalupi.

Baccigalupi created a predatory tactic he descriptively termed "root canal," which he used to control older agents such as Subbe-Hirt. Baccigalupi instructed his sales managers how to perform this verbal attack "operation." According to sales manager Meyer, Baccigalupi "came up with the concept of root canal as a way to intimidate and basically destroy these people to the point of submission or of just getting the hell out of the business." Meyer related at his deposition that Baccigalupi picked the term "root canal"

specifically because it was made to be a very uncomfortable, pain-producing, anxiety-producing procedure that you would keep going deeper and deeper until you struck a nerve, which would either end up in the agent submitting, or reaching the point of anxiety where they just couldn't stand any job any longer.

According to Meyer, at Thursday management meetings, sales managers would role play with each other how to deal with "problem agents:"

. . . Bob LaNicca had brought up that he was having problems dealing with [Subbe-Hirt]. And then [Baccigalupi] would role play with Bob LaNicca how to perform root canal on Elaine to harass, intimidate her into submitting to management's requests.

LaNicca's deposition indicates that Subbe-Hirt was "brought in more often than others for performance reviews," which was Baccigalupi's opportunity for using his root canal procedure on her. According to Subbe-Hirt, Baccigalupi "held [her] in the office twice as long as anyone else."

Baccigalupi was relentless in his contumely against Subbe-Hirt. To begin with, according to Meyer and Parisi, Baccigalupi replaced females' given names, and other polite nouns such as

"lady" and "woman," with the term "cunt," to depersonalize and deride the women in the office. He would also taunt Subbe-Hirt by asking if she "knew the word heretic" and threaten her "by asking if she knew who Joan of Arc was." Moreover, he would ask Subbe-Hirt for her resignation almost every time she was in the office. Baccigalupi even went so far as to have an unsigned resignation on his desk; we would then ask Subbe-Hirt "why don't you sign it; if you don't want to sign it, go on disability."

In his meetings with Subbe-Hirt, Baccigalupi would "grill" her on work she submitted, asking "why did you do this, what did you do here, what was said here?" If he was not "satisfied" with her answer, he would call Subbe-Hirt's clients in front of her and say "Elaine says this; what do you say?"

Baccigalupi's conduct had a devastating consequence. After one meeting with Baccigalupi, Subbe-Hirt "literally blacked out behind the wheel and hit a tractor trailer just from stress and emotion[,]" suffering severe injuries that required eight days of hospitalization. This incident forced Subbe-Hirt to take temporary disability leave; indeed, her treating psychiatrist has opined that she remains totally disabled with post traumatic stress disorder triggered by Baccigalupi's badgering and intimidation.

Baccigalupi was on notice that such an incident was a distinct possibility. Before the collision, Subbe-Hirt had consulted with her family doctor because of stress. The doctor wrote a letter which Subbe-Hirt showed to Baccigalupi before the incident, asking that it be placed in her personnel file. It stated:

Elaine Subbe[-Hirt] is currently under my care for tension syndrome. It is my opinion, that she is capable of working a regular forty hour week at her present position. However, she should not be subject [sic] to any undue stress or work load at this time.

When Subbe-Hirt requested that the letter be placed in her personnel file, Baccigalupi refused, his exact words being: "I'll decide what goes in your personnel file." According to the evidence, "Mr. Baccigalupi handed it back to [her] and said he didn't see that letter, and he never wanted to see it again and he wouldn't put it in [her] file." From this evidence, a jury could well-conclude that, in his attempt to drive Subbe-Hirt out of Prudential, Baccigalupi targeted her now-documented weakness, of which he was fully cognizant. Such specific targeting of an individual's weak point is itself a classic form of "outrageous" conduct under Restatement § 46, comment f, which provides:

The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical and mental condition or peculiarity. The conduct may be heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.

We conclude that the record is sufficient to support a finding that Baccigalupi essentially set out to put Subbe-Hirt under unnecessary stress to force her out of the company, all the while knowing that her physician had stated specifically that her condition required her to avoid such stress. We hold that the evidence described above is more than sufficient to withstand defendants' motion for summary judgment.

## IV.

The allegations about Baccigalupi's uncivil conduct, and the record before us display a pattern of ill behavior and concomitant distress sufficient to preclude summary judgment. We will reverse the summary judgment and remand the cause to the district court for further proceedings.

Subbe-Hirt v. Baccigalupi
No. 95-5786

COWEN, Circuit Judge, dissenting.

The decision of the district court dismissing the appellant-plaintiff's claim for intentional infliction of emotional distress should be affirmed for two separate and distinct reasons: the claim is clearly within the exclusivity provision of New Jersey Worker's Compensation Act (the "WCA" or the "Act") and not saved from the Act by the exception which permits claims for intentional wrongs. In addition, the conduct allegedly engaged in by the defendant clearly was not so outrageous so as to meet the minimal requirements under New Jersey law for a cause of action for intentional infliction of emotional distress.

## I.
### New Jersey Worker's Compensation Law

The New Jersey Worker's Compensation Act provides an automatic addition to any employment contract entered into in the state, unless the parties at the time of the employment contract expressly disclaim that the WCA be part of the employment agreement. N.J.S.A. 34: 15-8. Under the Act employees are barred from pursuing remedies against their employer or the employer's agent relating to injuries received by reason of the employment relationship, other than a worker's compensation claim under the Act. The pertinent provisions of the WCA, as relevant to this matter, states:

> If an injury or death is compensable under
> this article, a person shall not be liable to
> anyone at common law or otherwise on account

                    of such injury or death for any act or
                    omission occurring while such person was in
                    the same employ as the person injured or
                    killed, except for intentional wrong.

N.J.S.A. 34:15-8 (emphasis added).

All claims by employees who suffered injury or illness by reason of their employment must be made pursuant to the administrative procedure set forth in the Worker's Compensation Act. The sole exception which the Legislature carved out allowing an employee to sue the employer at law, and bypass the administrative framework of the Worker's Compensation Act, is if the claim arose by reason of an "intentional wrong." Id.

The law in New Jersey is well-settled. To invoke this narrow exception to the Worker's Compensation Act, the employee must prove that the action of the employer was substantially certain to cause the harm. Millison v. E.I. DuPont DeNemours & Co., 101 N.J. 161, 177 (1985), aff'd 115 N.J. 252 (1989). The New Jersey courts have been careful to explain that for an action to be "substantially certain" to be the cause of an injury or illness, the individual bringing about the injury must be found to have known with "virtual certainty" that the act would produce the injury. Bustamante v. Tuliano, 248 N.J. Super. 492, 498 (App. Div. 1991).

Even when considering all inferences which can reasonably be drawn from the pleadings and plaintiff's affidavits, the district court correctly concluded that the claim did not approach the narrow intentional wrong exception which is necessary under the Act for an employee to sue an employer at law for a work related illness.

In order to find refuge from the exclusivity provision of the Worker's Compensation Act, an employee suffering from emotional distress and disability arising from employment cannot avoid the administrative provisions of the Worker's Compensation Act by simply characterizing as "intentional" the employer's acts which caused the illness. Even crediting plaintiff's allegations, and acknowledging that the conduct of her supervisor and employer was offensive and uncalled for, such conduct did not constitute an exception to the exclusivity provision of the Worker's Compensation Act.

The New Jersey Legislature never envisaged that the intentional wrong exception would encompass the normal and even extreme comments which arise in an employment relationship. To hold, as the majority does today, that criticism and harsh statements concerning work practices, competence and ability of an employee are sufficient to constitute intentional wrongs within the meaning of the Worker's Compensation Act is to be insensitive to the realities of the workplace. The majority fails to reckon with true employment reality. The workplace often is a hard-driving environment. Competitive imperatives may call for clear, sometimes insulting language, and one's immediate supervisor will often be perceived as crude, impersonal and insulting. The workplace is not afternoon tea or a day at the

beach.  We should not, and the New Jersey Legislature never envisaged that courts would, censor the language or dialogue in the workplace.

The district court analyzed the parameters of the intentional wrong exception and correctly concluded that plaintiff's allegations reflect that Baccigalupi engaged in conduct which was consistent with behavior or practices sometimes engaged in as part of the business environment or employment relationship.  The majority may not like the employer's words or conduct, and I agree that the words were uncouth and gross.  But, like it or not, these are the words which the employer chose, and such is the opinion of some employers of their employees.  We should not be in the business of scripting dialogue in the workplace.

Plaintiff relies heavily on Cremen v. Harrah's Marina Hotel Casino, 680 F. Supp. 150 (D.N.J. 1980).  Cremen is clearly distinguishable from this matter.  The plaintiff in Cremen was raped by her supervisor who continued to physically abuse her with physical as well as mental encounters.  The Cremen court correctly concluded that such assaults were not part of the landscape in any work environment and that the emotional distress which resulted from the conduct was outside of the Worker's Compensation Act.  The plaintiff's case before us in its totality is based solely on words.  Words not even spoken to her.  Words that she claims made her sick and should not have been used to describe her performance in the work environment or characterize her as an employee.  Plaintiff's allegations are a far cry from Cremen.  She can cite no other New Jersey case in which the "intentional wrong exception" was found to apply to support her position.

The plaintiff has failed to allege facts which would take the admittedly harsh language out of the work environment.  All of the remarks leveled by plaintiff's supervisor were directed to her work performance and all of his comments concern the employment relationship.  Not one of the alleged "intentional wrongs" are removed from the proper subject of an employer's evaluation and opinions concerning work performance or job competence.  While we as individuals may have our view as to the proper language that should transpire at a work site, it does not lie in the province of the judiciary to instruct employers on proper etiquette or set ourselves up as the super-Emily Post of the workplace.

II.

Separate and apart from the allegations of the plaintiff not qualifying as an "intentional wrong," the facts of the case as alleged by the plaintiff fall short of the New Jersey cause of action of intentional infliction of emotional distress. The New Jersey Supreme Court has defined this tort as requiring conduct "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366 (1988). The conduct of the perpetrator of such a tort must be by its

nature "so severe that no reasonable man could be expected to endure it."  Id.

Conduct which the New Jersey courts have found to meet this extremely high level of uncivilized conduct are such matters as a doctor knowingly and untruthfully advising parents that their child had cancer, Hume v. Bayer, 178 N.J. Super. 310, 317–19 (Law Div. 1981); a hospital unable to locate the body of a dead baby for three weeks, Muniz v. United Hospitals Medical Center, 153 N.J. Super. 79 (App. Div. 1977).  The federal court has recognized the extreme difficulty of establishing such a claim in a mere employment relationship when the conduct alleged does not exceed the employer/employee relationship.  See Fregara v. Jet Aviation Business Jets, 764 F. Supp. 940, 956 (D.N.J. 1991); Alm v. Marriot Corp., No. 90–3648 WL 313897 (D.N.J. Nov. 6, 1991); Borecki v. Eastern Intern. Management Corp., 694 F. Supp. 47 (D.N.J. 1988).  After Buckley, it has been recognized that "New Jersey has prescribed a heavy burden for one alleging intentional infliction of emotional distress."  Obendorfer v. Gitano Group, Inc., 838 F. Supp. 950 (D.N.J. 1993).

The New Jersey Supreme Court has made it abundantly clear in Buckley, that when a claim is made for intentional infliction of emotional distress, the trial court must clearly exercise a gatekeeping rule:  "the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved.)  Id. at 367.  It is the obligation of the trial court to determine in the first instance whether the plaintiff has set forth conduct which is sufficiently extreme such that a jury could reasonably conclude that outrageous conduct permits it to award damages.  Contrary to the opinion of the majority, the district court did not overstep its role with respect to the claim of intentional infliction of emotional distress since the trial court is mandated under New Jersey law to determine in the first instance "whether reasonable minds could conclude that that alleged conduct has met [outrageous] standard."  See Obendorfer v. Gitano Group, Inc., 838 F. Supp. at 955; Borecki v. Eastern Intern. Management Corp., 694 F. Supp. at 61.

The district court correctly performed its function by determining that under New Jersey law the facts alleged as a matter of law failed to reach the elevated and high standard required for the cause of action of intentional infliction of emotional distress.  The district court recognized that Baccigalupi's statements, if credited, were "inexcusable" and "offensive," but did not rise to the level of outrageous and unacceptable in a civilized society.  Plaintiff's claims boil down to an assertion that her supervisor's choice of words required her to put up with "more than the normal pressure of a job."  Being subject to "more than normal pressure" at work is a long distance from conduct that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Even plaintiff had a difficult time labeling Baccigalupi's actions as anything beyond harmless threats, intimidation, and ridicule.  Admittedly, the words

allegedly spoken by Baccigalupi were strong and even harsh at times, but they were merely words. There is no proof, nor even an allegation, that Baccigalupi even touched her or that he set in motion any physical or other instrumentality to bring about an injury or illness.

## III.

The majority is to be lauded in its desire to upgrade the repartee of the workplace and to be offended by language which it deems inappropriate. But the workplace is not the dance of a minuet and employers are not nursemaids. As judges we will rue the day we sat in judgment of the propriety of speech which should transpire in the workplace between an employer and his employee. I respectfully dissent.