872 So.2d 415 (2004)
WINSTON PARK, LTD., a Florida Limited Partnership, Appellant,
v.
CITY OF COCONUT CREEK, a Florida Municipal Corporation, Appellee.
No. 4D03-5.
District Court of Appeal of Florida, Fourth District.
May 5, 2004.
*416 William S. Spencer, Fabienne E. Fahnestock and Christian A. Petersen of Gunster, Yoakley & Stewart, P.A., Fort Lauderdale, for appellant.
Nancy Little Hoffmann of Nancy Little Hoffmann, P.A., Pompano Beach, and Maurice M. Garcia of Abrams, Anton, P.A., Hollywood, for appellee.
STEVENSON, J.
This appeal concerns a breach of contract and declaratory action by appellant, Winston Park, Ltd. (Winston Park), against appellee, the City of Coconut Creek (City), regarding the parties' rights, duties and obligations with respect to a 1983 agreement concerning the construction and use of certain water and sewage transmission facilities. Because we find the existence of genuine issues of material fact, we reverse the trial court's order granting summary judgment in favor of defendant/appellee, the City.

The 1983 Agreement
In 1983, a group of property owners (Participants) in the City of Coconut Creek formed the Coconut Creek Pollution Elimination Company (Company). Winston Park, a developer in the City, is the successor in interest to one of the original Participants in the Company.
On June 23, 1983, the City and Company entered into an Agreement ("1983 Agreement"), wherein the Company agreed to finance, construct and then convey to the City a portion of the primary water distribution pipelines and sewage transmission facilities through which the City would provide water and sewer services to the Participants' properties and the properties of others to be served by the City. By entering into the 1983 Agreement, the City was relieved of the obligation to build and finance the construction of the water and sewer transmission facilities.
The 1983 Agreement provided the minimum capacity of the water distribution pipelines and sewage transmission facilities to be constructed by the Company and defined how the capacity would be measured:
The COMPANY warrants that the facilities to be constructed shall provide a minimum of 10,000 ERC's [Equivalent Residential Connections] of water and sewer capacity. An ERC, for purposes of this Agreement, will be defined as a unit of measurement equal to a water flow of 350 gallons per day and a sewer flow of 285 gallons per day.
Each of the original Participants to the 1983 Agreement, including the City, reserved for itself a specific number of ERC's making up the 10,000 ERC's. It is undisputed that the City reserved 3,000 ERC's for itself and has since utilized all 3,000 ERC's. Winston Park was assigned a total of 3,000 ERC's from its predecessor in interest and original Participant in the Company. The total cost attributed to the construction of the facilities supported 10,000 ERC's. Under the 1983 Agreement, the City could not divert the Company's share of water and sewer capacity to other areas within the City limits of the City without the Company's express written consent.
The 1983 Agreement made it mandatory for each Participant to surrender any "unused *417 capacity" or ERC's to the City when it completed construction of its development and provided the means for a Participant to allocate or sell its unused ERC's to a third party. The 1983 Agreement provides:
[A]ny unused capacity shall be surrendered to the CITY in writing on a form of an affidavit supplied by the CITY that shall include the name of the owner/holder of any such unused capacity, the exact amount of any unused capacity expressed in ERC's currently available and the cost of said capacity as hereinafter defined. Upon the surrender of such capacity, the COMPANY ... shall be given a right of first refusal as to those ERC's surrendered by other shareholders or participants.
... Any purchase by any such shareholders, participants and successors shall be the first to respond in writing and pay for the same in cash and in full to the City Manager. In the event no such participant ... responds in writing and pays for said ERC's within 30 days, the CITY shall be free to dispose of said unused ERC's as hereinafter provided.
Upon the allocation of said ERC's as determined by the CITY to any third parties by the CITY, the former owner/holder of said unused ERC's shall, within 30 days of the receipt by the City of the full amount then charged, receive from the CITY a sum equal to 80% of the full amount then charged for such capacity by the CITY. However, the CITY shall not be required to accept at any time, any unused ERC's offered to the CITY by the shareholders, participants and successors. (emphasis added).
The City does not operate or maintain a water treatment plant or a sewage treatment and disposal collection system. Instead, the City receives bulk potable water and its allocation of sewer capacity under a Water Agreement and Wastewater Agreement (collectively "Large User Agreement"), entered into between the City and Broward County in 1973 and 1981, respectively. As such, the 1983 Agreement contemplated that the City would be required to increase its projection of bulk potable water and the allocation of sewer capacity it receives from Broward County to meet and secure the 10,000 ERC's of water and sewer capacity reserved by the Participants. If City could not secure the commitment from Broward County, the Company was not obligated to construct the water and sewer transmission facilities.

The Lawsuit
In the mid 1990's, Winston Park completed development on a community it was building and determined it had 296 excess unused ERC's and sought to surrender them to the City for allocation to another developer, Engle Homes, who was building a community called Banyan Trails in the City. Winston Park orally agreed to sell its excess ERC's to Engle Homes for $2,400 each. Subsequently, Winston Park tendered to the City of Coconut Creek a surrender of unused ERC capacity, specifically expressed as "296 ERC's." The City, however, refused to allow Winston Park to transfer its excess ERC's to Engle Homes and informed Winston Park that it was exercising its right under the agreement to decline to accept the unused ERC's. Instead, the City sold 296 ERC's to Engle Homes directly for $3,200.00 each. The City later declined to pay Winston Park 80% of the money received from the sale as requested.
Winston Park subsequently filed the instant lawsuit for breach of contract and declaratory relief, alleging that the City allocated or sold Winston Park's water and sewer capacity within the Company system to Engle Homes without paying it 80% of the money received from the sale.
*418 The parties took differing positions at the hearing on the motion for summary judgment. Winston Park argued that the pipelines built by the Company under the 1983 Agreement had a finite transmission capacity and, as such, it could carry no more than 10,000 ERC's of water and sewer capacity. Thus, the City had ERC's available for allocation to Engle Homes only because of the 296 unused ERC's it owned. Winston Park, through a series of exhibits, showed that the master utilities plan for the development of Banyan Trails was connected to and receives water from the pipelines the Company built under the 1983 Agreement. Alternatively, Winston Park argued that even if it could be assumed that the pipelines were capable of carrying more than 10,000 ERC's, the City was required to first reimburse it for the remaining available ERC's, up to 10,000 ERC's, and then it could sell ERC's above and beyond that.
The City disputed that the pipelines built by the Company were sized to carry only 10,000 ERC's of water and sewer capacity, stating that the "[pipe]lines are the backbone of the City." The City also argued that it did not sell Winston Park's ERC's to Engle Homes; instead, it acquired additional ERC's from Broward County through the Large User Agreement. The City maintained that since the 1983 Agreement contemplated that the water pipelines and sewage transmission lines constructed by the Company would serve other properties within the City, and outside of the designated area for which they were constructed, the City was free to pass these additionally-obtained ERC's through the facilities. The City further argued that it was not required to accept the 296 unused ERC's tendered by Winston Park; thus, it was not contractually bound to pay Winston Park for its unused ERC's.
The trial court granted the City's motion for summary judgment on the basis that the ERC's the City sold were "outside the scope of the boundaries of the original [1983] agreement" and that the City was not required to accept Winston Park's unused ERC's. It is from this final judgment that Winston Park appeals.

The Decision
When a defendant moves for summary judgment, the court is not called upon to determine whether the plaintiff can actually prove his cause of action. See Publix Super Mkts., Inc. v. Schmidt, 509 So.2d 977 (Fla. 4th DCA 1987). Rather, the court's function is solely to determine whether the record conclusively shows that the moving party proved a negative, that is, "the nonexistence of a genuine issue of a material fact." Besco USA Int'l Corp. v. Home Sav. of Am. FSB, 675 So.2d 687, 688 (Fla. 5th DCA 1996). If the record reflects even the possibility of a material issue of fact, or if different inferences can reasonably be drawn from the facts, the doubt must be resolved against the moving party. See id.
In the instant case, we reverse because we find that the record does not conclusively show that the City did not utilize Winston Park's unused ERC's or that the ERC's Engle Homes purchased were "outside the boundaries" of the agreement. While the 1983 Agreement gave the City the option to refuse to accept the ERC's "at any time," questions of fact still remain as to whether the City's subsequent actions constituted a utilization, and therefore an implicit acceptance of Winston Park's unused ERC's.
The record is unclear, and the parties do not agree, as to whether the facilities built by the Company have a water and sewage capacity in excess of 10,000 ERC's. While the 1983 Agreement speaks in terms of a minimum of 10,000 ERC's of water and *419 sewer capacity, the Company system could have ultimately been built to accommodate a maximum capacity of 10,000 ERC's of water and sewer. The City responds to this argument by stating that nothing in the 1983 Agreement demonstrates that the Company system could accommodate no more than 10,000 ERC's. However, the counter argument is also true. There is no evidence that the Company system could accommodate more than 10,000 ERC's of water and sewer capacity, and any doubts in the record must be resolved against the City, as movant. At the hearing on the motion for summary judgment, Winston Park showed that the ERC's the City sold to Engle Homes are connected to the Company System. If the Company System has a finite capacity as Winston Park suggests, then questions of fact remain as to whether the City implicitly accepted and sold Winston Park's ERC's to Engle Homes.
The Large User Agreement attached to the 1983 Agreement provides no clarity on the City's position that the ERC's sold to Engle Homes were obtained from Broward County and, as such, are "outside the boundaries of the original agreement." From what we glean from the record, the Large User Agreement and the amendments thereto contemplated that Broward County would be the City's source of potable water and sewer treatment. Broward County provided the potable water to, and sewer treatment from, certain "Points of Connection"[1] located at areas mutually agreed to between the City and Broward County; and the City, through its own water distribution system, like the one built by the Company, brought water to and sewer from the "Points of Connection" to the end users.[2]
We recognize support in the record for the City's position that the Large User Agreement was a source from which the City could increase its "metered capacity" of potable water or "reserved capacity" of wastewater from Broward County to the "Points of Connection." However, the record does not conclusively establish what affect, if any, Broward County's agreement to provide additional potable water to the City, and to increase its reserve capacity of wastewater, had on the Company facilities and the agreement between the Company and the City. The pipelines provided by the Company could presumably be one of the many primary distribution systems within the City, and it is also possible that the City could have built additional transmission facilities to accommodate the increase in water and sewer capacity as it did in 1983. Because relevant factual issues *420 remain disputed and unresolved on the record, summary judgment was inappropriate.
Since we reverse, we find it unnecessary to address Winston Park's additional arguments.
REVERSED and REMANDED.
SHAHOOD, J., and GEIGER, DWIGHT L., Associate Judge, concur.
NOTES
[1] The Water Agreement provides that "[t]here shall be one or more master meters installed, at points mutually agreeable, through which all water supplied to customers of COCONUT CREEK within the areas described in Exhibit A shall be supplied."

The Wastewater Agreement states that "POINT(S) OF CONNECTION" mean "the POINT(S) where the CUSTOMER'S [City] system connects to the COUNTY system for the purpose of delivering wastewater into the COUNTY system from the CUSTOMER'S [City] system."
[2] For example, the Water Agreement states "the Consumer [City] shall not pump water into its water distribution system" and "the Consumer [City] shall not allow any customer [citizen] to connect with the Consumer's [City] distribution system."

The Wastewater Agreement also states:
CUSTOMER [City] agrees to construct where necessary, and to operate and properly maintain at its own cost and expense, all sanitary gravity sewers, lifts stations, pumping stations, force mains, and other required appurtenances related and directly attributable to the wastewater collection system upstream of the POINT(S) OF CONNECTION that are necessary to properly and continuously collect and convey sanitary wastewater to the POINT(S) OF CONNECTION....