WARNER, J.
Appellant challenges the trial court’s summary judgment in his personal injury claim against his employer. The trial court concluded that the employer had worker’s compensation immunity based upon the facts of the case. The appellant contends that material issues of fact remained as to whether he met the exception for employer immunity set forth in section 440.11, Florida Statutes. We agree with the trial court that, based upon the narrow exception adopted by the Legislature that an employer must know that its conduct is virtually certain to cause injury, the employer is entitled to immunity.
Appellant, Gorham, an employee of ap-pellee, Zachry Industrial, Inc., sued Za-chry in June 2008, alleging an intentional tort causing injury to appellant while he was working on a construction project. Zachry had contracted with Florida Power & Light (“FPL”) to build a natural gas plant in Loxahatchee, Florida. During the process of setting a wall at the plant, Gorham was injured. To avoid Zachry’s statutory worker’s compensation immunity from tort, he alleged in his complaint that Zachry “engaged in conduct that it knew based on explicit warnings specifically identifying a known danger was virtually certain to result in injury or death to [Gorham],” and that Gorham “was not aware of the risk because the danger was not apparent and [Zachry] deliberately concealed or misrepresented the danger so as to prevent [Gorham] from exercising informed judgment about whether to perform the work.” Gorham sought damages based on the accident.
The incident in which Gorham was injured occurred while Gorham was working as a rigger on the FPL power plant construction site. On the day of the accident, the crew was attempting to lift and place a nine-ton wall. Two cranes were available *631 to lift the large pre-fabricated wall into place. A tag line to keep the wall from swaying as the crane lifted the wall was attached to the wall, and because of the danger of swaying, attention to the wind speed was very important. On the day before the incident, the general foreman cancelled this lift because the winds were over 20 miles per hour.
That morning, the general foreman and the supervising foreman conducted a safety meeting with the crew. They filled out a Safety Task Assignment form. The form contained questions such as “How Can I Get Hurt.” The supervisor filled in “Bad Weather.” Another entry asked “How Can I Keep From Getting Hurt,” and the supervisor wrote, “Watch for lightning & high winds.” The entire crew, including Gorham, signed the form.
The morning of the incident Gorham participated in the first lift, in which the wall was raised slightly. Gorham said he didn’t feel any wind. The crane operator could not check the wind speed, however, because his crane did not have an anemometer, although he noted that there was no wind at 10:15 a.m. Even so, the crane operator radioed the general foreman to ascertain if he had checked the wind speed, who said that he had, and the speed was 16-18 miles per hour. The crane operator, however, recalled that the foreman told him the speed was 12-15 miles per hour.
At the time of the lift, Gorham was on the tag line. The general foreman sounded the horn, meaning that the lift would commence. After the wall was vertical, Gorham walked over to help others disconnect shackles off the wall. The crane operator began to move the wall alongside the cooling tower near the site, and once the wall got into that area, “[t]he wind owned it.” Gorham tried to stabilize the wall, which then began dragging Gorham.
The crane operator sounded the emergency horn, which means that “everybody is supposed to run” and “[l]et it go.” Gor-ham, however, did not let go, grabbed a rope around his arm, and wrapped his arm ai’ound the tag line. The crane operator pulled the swinging wall up against the stack to stop the movement. The operator told the general foreman that the wind grabbed the wall as it came around the corner and that Gorham was holding onto the rope at the time. Gorham received significant injuries to his arm.
The crane operator waited for the wind to die down for forty-five minutes to an hour and then made the second attempt. In the meantime, he checked the wind again, which was varying between 5 and 25 mph. The wind continued to cause difficulties in completing the second lift.
In his deposition, Gorham testified that he thought that the general foreman had not checked the wind speed, even though the crane operator had called him for a check. Gorham was certain that no one checked the wind speed, except for at 8 a.m. that morning, while the lift occurred around noon. He testified, however, that because he was on the tag line (which would be more dangerous in higher winds), he, too, asked the general foreman to check the wind, although he did not believe that the foreman actually checked the wind.
Contrary to Gorham’s testimony, the general foreman said that Gorham had not personally asked him to check the winds. Nevertheless, he had checked the winds as requested by the supervising foreman, and they were at 16-18 miles per hour. As noted above, the crane operator recollected that the general foreman had reported winds between 12 to 15 miles per hour, because he would not have made the lift if the winds were 18 miles per hour. Gor- *632 ham testified that it was the crane operator who told him after the incident that the winds had not been checked.
Gorham admitted that “[t]he wind is the first” danger in performing such a lift, since it “is always a factor.” He said, “The weather is 90 percent of it.” He admitted that he had always been aware of these dangers. However, Gorham testified that even with this knowledge, he “counted on [the foreman] to tell me, either make the lift or not make the lift.” Additionally, Gorham stated that even though he thought the wind speed “had to be over 30 miles an hour,” he “was kind of under the impression that the wind speed was fine because of what I got from my general foreman ... that the wind was fine is exactly what I was told.” Before the lift, however, another crew member and Gor-ham had a conversation in which both agreed that while there may not be a problem with the wind standing the wall up, there may be a problem setting it.
However, Gorham also testified that the general foreman “may have” told him that the wind speed was 12 or 18 miles per hour, at which point Gorham would have admittedly gone ahead with the lift. Gor-ham also acknowledged that when he was walking the entire path of the lift before the lift, he observed sand blowing off the ground “[r]ight in front of the crane,” which made him believe that “[t]he wind was too high through the whole thing.”
Zachry moved for summary judgment. In its motion, Zachry argued that there are no disputed issues of material fact on the question of whether it was entitled to immunity under section 440.11(1), Florida Statutes, which provides for workers’ compensation immunity when the plaintiff is provided with workers’ compensation. After a lengthy hearing on all the issues, the court granted the summary judgment, ruling that Gorham did not demonstrate the statutory requirements for the exception to workers’ compensation immunity. First, the employer did not know, as a result of an explicit warning of a known danger, that there was a virtual certainty that injury or death would occur as a result of the lift. Second, Gorham was aware of the risks involved, and no evidence showed that the employer deliberately misled him into taking a risk. Gor-ham appeals this summary judgment.
We review such a summary judgment de novo. Bender v. CareGivers of Am., Inc., 42 So.3d 893, 894 (Fla. 4th DCA 2010). “When reviewing a ruling on summary judgment, an appellate court must examine the record in the light most favorable to the non-moving party; the burden is upon the moving party to show conclusively the complete absence of any genuine issue of material fact.” Harvey v. Deutsche Bank Nat. Trust Co., 69 So.3d 300, 303 (Fla. 4th DCA 2011). In considering a summary judgment, the trial court determines only whether the moving party has proved a negative — the non-existence of a material fact. Winston Park, Ltd. v. City of Coconut Creek, 872 So.2d 415, 418 (Fla. 4th DCA 2004).
Section 440.11, Florida Statutes, provides for immunity of an employer from personal injury suits for work-related injuries. It also includes an exception for intentional torts:
The liability of an employer ... shall be exclusive and in place of all other liability, including vicarious liability, of such employer to any third-party tortfeasor and to the employee ... except ... [w]hen an employer commits an intentional tort that causes the injury or death of the employee. For purposes of this paragraph, an employer’s actions shall be deemed to constitute an intentional tort and not an accident only when the employee proves, by clear and *633 convincing evidence, that[ ] ... [t]he employer engaged in conduct that the employer knew, based on prior similar accidents or on explicit warnings specifically identifying a known danger, was virtually certain to result in injury or death to the employee, and the employee was not aware of the risk because the danger was not apparent and the employer deliberately concealed or misrepresented the danger so as to prevent the employee from exercising informed judgment about whether to perform the work.
§ 440.11(l)(b)2., Fla. Stat. Thus, the elements which the employee must prove for the intentional tort exemption to workers compensation immunity are: 1) employer knowledge of a known danger, based upon prior similar accidents or explicit warnings specifically identifying the danger that was virtually certain to cause injury or death to the employee; 2) the employee was not aware of the danger, because it was not apparent; and 3) deliberate concealment or misrepresentation by the employer, preventing employee from exercising informed judgment as to whether to perform the work. Id. See also Fla. Std. Jury Instr. (Civ.) 414.5. All three elements must be proved by clear and convincing evidence to overcome statutory immunity of the employer.
“Essentially, under this no-fault system, the employee gives up a right to a common-law action for negligence in exchange for strict liability and the rapid recovery of benefits.” Turner v. PCR, Inc., 754 So.2d 683, 686 (Fla.2000). The language of the current version of the statute, which is applicable in this case, was adopted by the Legislature in 2003 as a reaction to Turner, in which the court adopted an objective, but less stringent, construction of the intentional tort exception. Our supreme court acknowledged that the virtual certainty standard of employer conduct adopted by the Legislature is more strict than the standard of Turner. See Travelers Indent. Co. v. PCR Inc., 889 So.2d 779 (Fla.2004). The court compared it to the standard used in New Jersey under a similar law:
This newly enacted, virtual-certainty standard is similar to the standard adopted by the New Jersey Supreme Court in Millison v. E.I. du Pont de Nemours & Co., 101 N.J. 161, 501 A.2d 505 (1985)....
The strictness of the Millison standard (and its similarity to Florida’s newly enacted, virtual-certainty standard) was revealed not only by the New Jersey Supreme Court’s articulation, but also by its application of the standard. Millison held that the employees’ claim that their employer knowingly allowed them to be exposed to asbestos and concealed from them the known dangers of such exposure “c[a]me up short of the ‘substantial certainty5 needed to find an intentional wrong resulting in avoidance of the exclusive-remedy bar of the compensation statute.” 501 A.2d at 514-15. By contrast, the court held that the employees’ second claim did meet the standard. That claim alleged that the employer (through workplace physical examinations performed by company doctors) learned that the employees were suffering from asbestos-related diseases and fraudulently concealed this fact from the employees. Id. at 516 (“These allegations go well beyond failing to warn of potentially-dangerous conditions or intentionally exposing workers to the risks of disease. There is a difference between, on the one hand, tolerating in the workplace conditions that will result in a certain number of injuries or illnesses, and, on the other, actively misleading the em *634 ployees who have already fallen victim to those risks of the workplace.... Such intentionally-deceitful action goes beyond the bargain struck by the Compensation Act.”).
Id. at 783 n. 5. Millison relied on Prosser on Torts and its definition of intentional conduct:
“[T]he mere knowledge and appreciation of a risk-something short of substantial certainty-is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong.”
501 A.2d at 514 (quoting W. Prosser & W. Keeton, The Law of Torts § 8, at 36 (5th ed.1984)). Our Legislature has taken this one step further and required virtual certainty, even more stringent than substantial certainty.
Based on this strict standard, Za-chry met its obligation of proving the nonexistence of the elements supporting an exclusion from statutory immunity. No evidence supports the requirement that “[t]he employer engaged in conduct that the employer knew, based on prior similar accidents or on explicit warnings specifically identifying a known danger, was virtually certain to result in injury or death to the employee.” § 440.11(l)(b)2., Fla. Stat. To prove that, there must be evidence that Zachry, through its foreman, knew that the wind speed was in excess of what was safe to perform the lift and that lifting in that condition would with virtual certainty produce injury or death. While there is a dispute as to whether the foreman even took readings, taking the evidence in favor of Gorham, it can be said that he did not take the wind readings and allowed the lift to occur not knowing what the wind speed was.
However, there is no evidence that such a lift would with virtual certainty cause injury. Indeed, that afternoon the lift was performed without any injuries, even in increasing wind speeds. The employer’s conduct may be grossly negligent, but as noted in Prosser, it is not intentional. Za-chry writes in its brief, “Gorham in essence alleged nothing more than withholding knowledge of a potentially dangerous condition.... Even if he had been able to establish as much, this is patently insufficient to show conduct that is ‘virtually certain’ to result in injury or death.” We agree.
Because the employer furnishes workers compensation to its employees on a strict liability basis, the exception to immunity from suit was drawn narrowly by the Legislature. Indeed, after Turner, the Legislature adopted an extremely strict exception which, we suspect, few employees can meet. To date, we have not found, nor has a case been cited to us, where an employer has lost its immunity for its conduct.
Written in the conjunctive, the statute requires satisfaction of all three of its elements to warrant an exception to the employer’s statutory immunity. As the evidence conclusively shows the absence of a material fact on the second element, the trial court correctly entered summary judgment for the employer.

Affirmed.

STEVENSON, J„ and STONE, BARRY J., Senior Judge, concur.